# IMMIGRATION AND NATURALIZATION SERVICE *v.* LOPEZ-MENDOZA ET AL.

No. 83–491.   Argued April 18, 1984—Decided July 5, 1984

O'CONNOR, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III, and IV, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined, and an opinion with respect to Part V, in which BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BRENNAN, J., *post*, p. 1051, WHITE, J., *post*, p. 1052, MARSHALL, J., *post*, p. 1060, and STEVENS, J., *post*, p. 1061, filed dissenting opinions.

*Deputy Solicitor General Frey* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee, Acting Assistant Attorney General Willard, Kathryn A. Oberly, Barbara L. Herwig, Marshall Tamor Golding,* and *Howard S. Scher.*

*Mary L. Heen* argued the cause for respondents. With her on the brief were *Burt Neuborne, Charles S. Sims, John E. Huerta, Joaquin G. Avila, Morris J. Baller,* and *Charles H. Barr.*

JUSTICE O'CONNOR announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, II, III, and IV, and an opinion with respect to Part V, in which JUSTICE BLACKMUN, JUSTICE POWELL, and JUSTICE REHNQUIST joined.*

This litigation requires us to decide whether an admission of unlawful presence in this country made subsequently to an allegedly unlawful arrest must be excluded as evidence in a civil deportation hearing. We hold that the exclusionary rule need not be applied in such a proceeding.

## I

Respondents Adan Lopez-Mendoza and Elias Sandoval-Sanchez, both citizens of Mexico, were summoned to separate deportation proceedings in California and Washington, and both were ordered deported. They challenged the regularity of those proceedings on grounds related to the lawfulness of their respective arrests by officials of the Immigration and Naturalization Service (INS). On administrative appeal the Board of Immigration Appeals (BIA), an agency of the Department of Justice, affirmed the deportation orders.

The Court of Appeals for the Ninth Circuit, sitting en banc, reversed Sandoval-Sanchez' deportation order and vacated and remanded Lopez-Mendoza's deportation order. 705 F. 2d 1059 (1983). It ruled that Sandoval-Sanchez' admission of his illegal presence in this country was the fruit of an unlawful arrest, and that the exclusionary rule applied in a deportation proceeding. Lopez-Mendoza's deportation order was vacated and his case remanded to the BIA to

_____

*THE CHIEF JUSTICE joins all but Part V of this opinion.

determine whether the Fourth Amendment had been violated in the course of his arrest. We granted certiorari, 464 U. S. 1037 (1984).

A

Respondent Lopez-Mendoza was arrested in 1976 by INS agents at his place of employment, a transmission repair shop in San Mateo, Cal. Responding to a tip, INS investigators arrived at the shop shortly before 8 a. m. The agents had not sought a warrant to search the premises or to arrest any of its occupants. The proprietor of the shop firmly refused to allow the agents to interview his employees during working hours. Nevertheless, while one agent engaged the proprietor in conversation another entered the shop and approached Lopez-Mendoza. In response to the agent's questioning, Lopez-Mendoza gave his name and indicated that he was from Mexico with no close family ties in the United States. The agent then placed him under arrest. Lopez-Mendoza underwent further questioning at INS offices, where he admitted he was born in Mexico, was still a citizen of Mexico, and had entered this country without inspection by immigration authorities. Based on his answers, the agents prepared a "Record of Deportable Alien" (Form I–213), and an affidavit which Lopez-Mendoza executed, admitting his Mexican nationality and his illegal entry into this country.

A hearing was held before an Immigration Judge. Lopez-Mendoza's counsel moved to terminate the proceeding on the ground that Lopez-Mendoza had been arrested illegally. The judge ruled that the legality of the arrest was not relevant to the deportation proceeding and therefore declined to rule on the legality of Lopez-Mendoza's arrest. *Matter of Lopez-Mendoza*, No. A22 452 208 (INS, Dec. 21, 1977), reprinted in App. to Pet. for Cert. 97a. The Form I–213 and the affidavit executed by Lopez-Mendoza were received into evidence without objection from Lopez-Mendoza. On the basis of this evidence the Immigration Judge found Lopez-

Mendoza deportable. Lopez-Mendoza was granted the option of voluntary departure.

The BIA dismissed Lopez-Mendoza's appeal. It noted that "[t]he mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding," *In re Lopez-Mendoza*, No. A22 452 208 (BIA, Sept. 19, 1979), reprinted in App. to Pet. for Cert. 100a, 102a, and observed that Lopez-Mendoza had not objected to the admission into evidence of Form I–213 and the affidavit he had executed. *Id.*, at 103a. The BIA also noted that the exclusionary rule is not applied to redress the injury to the privacy of the search victim, and that the BIA had previously concluded that application of the rule in deportation proceedings to deter unlawful INS conduct was inappropriate. *Matter of Sandoval*, 17 I. & N. Dec. 70 (BIA 1979).

The Court of Appeals vacated the order of deportation and remanded for a determination whether Lopez-Mendoza's Fourth Amendment rights had been violated when he was arrested.

### B

Respondent Sandoval-Sanchez (who is not the same individual who was involved in *Matter of Sandoval, supra*) was arrested in 1977 at his place of employment, a potato processing plant in Pasco, Wash. INS Agent Bower and other officers went to the plant, with the permission of its personnel manager, to check for illegal aliens. During a change in shift, officers stationed themselves at the exits while Bower and a uniformed Border Patrol agent entered the plant. They went to the lunchroom and identified themselves as immigration officers. Many people in the room rose and headed for the exits or milled around; others in the plant left their equipment and started running; still others who were entering the plant turned around and started walking back out. The two officers eventually stationed themselves at the main entrance to the plant and looked for passing employees who averted their heads, avoided eye contact, or tried to hide

themselves in a group. Those individuals were addressed with innocuous questions in English. Any who could not respond in English and who otherwise aroused Agent Bower's suspicions were questioned in Spanish as to their right to be in the United States.

Respondent Sandoval-Sanchez was in a line of workers entering the plant. Sandoval-Sanchez testified that he did not realize that immigration officers were checking people entering the plant, but that he did see standing at the plant entrance a man in uniform who appeared to be a police officer. Agent Bower testified that it was probable that he, not his partner, had questioned Sandoval-Sanchez at the plant, but that he could not be absolutely positive. The employee he thought he remembered as Sandoval-Sanchez had been "very evasive," had averted his head, turned around, and walked away when he saw Agent Bower. App. 137, 138. Bower was certain that no one was questioned about his status unless his actions had given the agents reason to believe that he was an undocumented alien.

Thirty-seven employees, including Sandoval-Sanchez, were briefly detained at the plant and then taken to the county jail. About one-third immediately availed themselves of the option of voluntary departure and were put on a bus to Mexico. Sandoval-Sanchez exercised his right to a deportation hearing. Sandoval-Sanchez was then questioned further, and Agent Bower recorded Sandoval-Sanchez' admission of unlawful entry. Sandoval-Sanchez contends he was not aware that he had a right to remain silent.

At his deportation hearing Sandoval-Sanchez contended that the evidence offered by the INS should be suppressed as the fruit of an unlawful arrest. The Immigration Judge considered and rejected Sandoval-Sanchez' claim that he had been illegally arrested, but ruled in the alternative that the legality of the arrest was not relevant to the deportation hearing. *Matter of Sandoval-Sanchez*, No. A22 346 925

(INS, Oct. 7, 1977), reprinted in App. to Pet. for Cert. 104a. Based on the written record of Sandoval-Sanchez' admissions the Immigration Judge found him deportable and granted him voluntary departure. The BIA dismissed Sandoval-Sanchez' appeal. *In re Sandoval-Sanchez*, No. A22 346 925 (BIA, Feb. 21, 1980). It concluded that the circumstances of the arrest had not affected the voluntariness of his recorded admission, and again declined to invoke the exclusionary rule, relying on its earlier decision in *Matter of Sandoval*, *supra*.

On appeal the Court of Appeals concluded that Sandoval-Sanchez' detention by the immigration officers violated the Fourth Amendment, that the statements he made were a product of that detention, and that the exclusionary rule barred their use in a deportation hearing. The deportation order against Sandoval-Sanchez was accordingly reversed.

## II

A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime. 8 U. S. C. §§ 1302, 1306, 1325. The deportation hearing looks prospectively to the respondent's right to remain in this country in the future. Past conduct is relevant only insofar as it may shed light on the respondent's right to remain. See 8 U. S. C. §§ 1251, 1252(b); *Bugajewitz* v. *Adams*, 228 U. S. 585, 591 (1913); *Fong Yue Ting* v. *United States*, 149 U. S. 698, 730 (1893).

A deportation hearing is held before an immigration judge. The judge's sole power is to order deportation; the judge cannot adjudicate guilt or punish the respondent for any crime related to unlawful entry into or presence in this country. Consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing. The respondent must be given "a reasonable opportunity to be present at [the] proceeding," but if the respondent fails to avail himself

of that opportunity the hearing may proceed in his absence. 8 U. S. C. § 1252(b). In many deportation cases the INS must show only identity and alienage; the burden then shifts to the respondent to prove the time, place, and manner of his entry. See 8 U. S. C. § 1361; *Matter of Sandoval*, 17 I. & N. Dec. 70 (BIA 1979). A decision of deportability need be based only on "reasonable, substantial, and probative evidence," 8 U. S. C. § 1252(b)(4). The BIA for its part has required only "clear, unequivocal and convincing" evidence of the respondent's deportability, not proof beyond a reasonable doubt. 8 CFR § 242.14(a) (1984). The Courts of Appeals have held, for example that the absence of *Miranda* warnings does not render an otherwise voluntary statement by the respondent inadmissible in a deportation case. *Navia-Duran* v. *INS*, 568 F. 2d 803, 808 (CA1 1977); *Avila-Gallegos* v. *INS*, 525 F. 2d 666, 667 (CA2 1975); *Chavez-Raya* v. *INS*, 519 F. 2d 397, 399–401 (CA7 1975). See also *Abel* v. *United States*, 362 U. S. 217, 236–237 (1960) (search permitted incidental to an arrest pursuant to an administrative warrant issued by the INS); *Galvan* v. *Press*, 347 U. S. 522, 531 (1954) (*Ex Post Facto* Clause has no application to deportation); *Carlson* v. *Landon*, 342 U. S. 524, 544–546 (1952) (Eighth Amendment does not require bail to be granted in certain deportation cases); *United States ex rel. Bilokumsky* v. *Tod*, 263 U. S. 149, 157 (1923) (involuntary confessions admissible at deportation hearing). In short, a deportation hearing is intended to provide a streamlined determination of eligibility to remain in this country, nothing more. The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws.

## III

The "body" or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred. See *Ger-*

*stein* v. *Pugh,* 420 U. S. 103, 119 (1975); *Frisbie* v. *Collins,* 342 U. S. 519, 522 (1952); *United States ex rel. Bilokumsky* v. *Tod, supra,* at 158. A similar rule applies in forfeiture proceedings directed against contraband or forfeitable property. See, *e. g., United States* v. *Eighty-Eight Thousand, Five Hundred Dollars,* 671 F. 2d 293 (CA8 1982); *United States* v. *One (1) 1971 Harley-Davidson Motorcycle,* 508 F. 2d 351 (CA9 1974); *United States* v. *One 1965 Buick,* 397 F. 2d 782 (CA6 1968).

On this basis alone the Court of Appeals' decision as to respondent Lopez-Mendoza must be reversed. At his deportation hearing Lopez-Mendoza objected only to the fact that he had been summoned to a deportation hearing following an unlawful arrest; he entered no objection to the evidence offered against him. The BIA correctly ruled that "[t]he mere fact of an illegal arrest has no bearing on a subsequent deportation proceeding."[1] *In re Lopez-Mendoza,* No. A22 452 208 (BIA, Sept. 19, 1979), reprinted in App. to Pet. for Cert. 102a.

## IV

Respondent Sandoval-Sanchez has a more substantial claim. He objected not to his compelled presence at a deportation proceeding, but to evidence offered at that proceeding. The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the

---

[1] The Court of Appeals brushed over Lopez-Mendoza's failure to object to the evidence in an apparently unsettled footnote of its decision. The Court of Appeals was initially of the view that a motion to terminate a proceeding on the ground that the arrest of the respondent was unlawful is, "for all practical purposes," the same as a motion to suppress evidence as the fruit of an unlawful arrest. Slip opinion, at 1765, n. 1 (Apr. 25, 1983). In the bound report of its opinion, however, the Court of Appeals takes a somewhat different view, stating in a revised version of the same footnote that "the only reasonable way to interpret the motion to terminate is as one that includes both a motion to suppress and a motion to dismiss." 705 F. 2d 1059, 1060, n. 1 (1983).

evidence and the unlawful conduct is not too attenuated. *Wong Sun* v. *United States*, 371 U. S. 471 (1963). The reach of the exclusionary rule beyond the context of a criminal prosecution, however, is less clear. Although this Court has once stated in dictum that "[i]t may be assumed that evidence obtained by the [Labor] Department through an illegal search and seizure cannot be made the basis of a finding in deportation proceedings," *United States ex rel. Bilokumsky* v. *Tod, supra,* at 155, the Court has never squarely addressed the question before. Lower court decisions dealing with this question are sparse.[2]

In *United States* v. *Janis*, 428 U. S. 433 (1976), this Court set forth a framework for deciding in what types of proceeding application of the exclusionary rule is appropriate. Imprecise as the exercise may be, the Court recognized in *Janis* that there is no choice but to weigh the likely social benefits of excluding unlawfully seized evidence against the likely costs. On the benefit side of the balance "the 'prime purpose' of the [exclusionary] rule, if not the sole one, 'is to deter future unlawful police conduct.'" *Id.,* at 446, quoting *United States* v. *Calandra,* 414 U. S. 338, 347 (1974). On the cost side there is the loss of often probative evidence and all of the secondary costs that flow from the less accurate or more cumbersome adjudication that therefore occurs.

At stake in *Janis* was application of the exclusionary rule in a federal civil tax assessment proceeding following. the unlawful seizure of evidence by state, not federal, officials. The Court noted at the outset that "[i]n the complex and tur-

---

[2] In *United States* v. *Wong Quong Wong*, 94 F. 832 (Vt. 1899), a District Judge excluded letters seized from the appellant in a civil deportation proceeding. In *Ex parte Jackson*, 263 F. 110 (Mont.), appeal dism'd *sub nom. Andrews* v. *Jackson*, 267 F. 1022 (CA9 1920), another District Judge granted habeas corpus relief on the ground that papers and pamphlets used against the habeas petitioner in a deportation proceeding had been unlawfully seized. *Wong Chung Che* v. *INS*, 565 F. 2d 166 (CA1 1977), held that papers obtained by INS agents in an unlawful search are inadmissible in deportation proceedings.

bulent history of the rule, the Court never has applied it to exclude evidence from a civil proceeding, federal or state." 428 U. S., at 447 (footnote omitted). Two factors in *Janis* suggested that the deterrence value of the exclusionary rule in the context of that case was slight. First, the state law enforcement officials were already "punished" by the exclusion of the evidence in the state criminal trial as a result of the same conduct. *Id.*, at 448. Second, the evidence was also excludable in any federal criminal trial that might be held. Both factors suggested that further application of the exclusionary rule in the federal civil proceeding would contribute little more to the deterrence of unlawful conduct by state officials. On the cost side of the balance, *Janis* focused simply on the loss of "concededly relevant and reliable evidence." *Id.*, at 447. The Court concluded that, on balance, this cost outweighed the likely social benefits achievable through application of the exclusionary rule in the federal civil proceeding.

While it seems likely that the deterrence value of applying the exclusionary rule in deportation proceedings would be higher than it was in *Janis*, it is also quite clear that the social costs would be very much greater as well. Applying the *Janis* balancing test to the benefits and costs of excluding concededly reliable evidence from a deportation proceeding, we therefore reach the same conclusion as in *Janis*.

The likely deterrence value of the exclusionary rule in deportation proceedings is difficult to assess. On the one hand, a civil deportation proceeding is a civil complement to a possible criminal prosecution, and to this extent it resembles the civil proceeding under review in *Janis*. The INS does not suggest that the exclusionary rule should not continue to apply in criminal proceedings against an alien who unlawfully enters or remains in this country, and the prospect of losing evidence that might otherwise be used in a criminal prosecution undoubtedly supplies some residual deterrent to unlawful conduct by INS officials. But it must be acknowledged

that only a very small percentage of arrests of aliens are intended or expected to lead to criminal prosecutions. Thus the arresting officer's primary objective, in practice, will be to use evidence in the civil deportation proceeding. Moreover, here, in contrast to *Janis*, the agency officials who effect the unlawful arrest are the same officials who subsequently bring the deportation action. As recognized in *Janis*, the exclusionary rule is likely to be most effective when applied to such "intrasovereign" violations.

Nonetheless, several other factors significantly reduce the likely deterrent value of the exclusionary rule in a civil deportation proceeding. First, regardless of how the arrest is effected, deportation will still be possible when evidence not derived directly from the arrest is sufficient to support deportation. As the BIA has recognized, in many deportation proceedings "the sole matters necessary for the Government to establish are the respondent's identity and alienage—at which point the burden shifts to the respondent to prove the time, place and manner of entry." *Matter of Sandoval*, 17 I. & N. Dec., at 79. Since the person and identity of the respondent are not themselves suppressible, see *supra*, at 1039–1040, the INS must prove only alienage, and that will sometimes be possible using evidence gathered independently of, or sufficiently attenuated from, the original arrest. See *Matter of Sandoval, supra*, at 79; see, *e. g.*, *Avila-Gallegos* v. *INS*, 525 F. 2d 666 (CA2 1975). The INS's task is simplified in this regard by the civil nature of the proceeding. As Justice Brandeis stated: "Silence is often evidence of the most persuasive character. . . . [T]here is no rule of law which prohibits officers charged with the administration of the immigration law from drawing an inference from the silence of one who is called upon to speak. . . . A person arrested on the preliminary warrant is not protected by a presumption of citizenship comparable to the presumption of innocence in a criminal case. There is no provision which forbids drawing an adverse inference from the fact of stand-

ing mute." *United States ex rel. Bilokumsky* v. *Tod*, 263 U. S., at 153–154.

The second factor is a practical one. In the course of a year the average INS agent arrests almost 500 illegal aliens. Brief for Petitioner 38. Over 97.5% apparently agree to voluntary deportation without a formal hearing. 705 F. 2d, at 1071, n. 17. Among the remainder who do request a formal hearing (apparently a dozen or so in all, per officer, per year) very few challenge the circumstances of their arrests. As noted by the Court of Appeals, "the BIA was able to find only two reported immigration cases since 1899 in which the [exclusionary] rule was applied to bar unlawfully seized evidence, only one other case in which the rule's application was specifically addressed, and fewer than fifty BIA proceedings since 1952 in which a Fourth Amendment challenge to the introduction of evidence was even raised." *Id.*, at 1071. Every INS agent knows, therefore, that it is highly unlikely that any particular arrestee will end up challenging the lawfulness of his arrest in a formal deportation proceeding. When an occasional challenge is brought, the consequences from the point of view of the officer's overall arrest and deportation record will be trivial. In these circumstances, the arresting officer is most unlikely to shape his conduct in anticipation of the exclusion of evidence at a formal deportation hearing.

Third, and perhaps most important, the INS has its own comprehensive scheme for deterring Fourth Amendment violations by its officers. Most arrests of illegal aliens away from the border occur during farm, factory, or other workplace surveys. Large numbers of illegal aliens are often arrested at one time, and conditions are understandably chaotic. See Brief for Petitioner in *INS* v. *Delgado*, O. T. 1983, No. 82–1271, pp. 3–5. To safeguard the rights of those who are lawfully present at inspected workplaces the INS has developed rules restricting stop, interrogation, and arrest practices. *Id.*, at 7, n. 7, 32–40, and n. 25. These

regulations require that no one be detained without reasonable suspicion of illegal alienage, and that no one be arrested unless there is an admission of illegal alienage or other strong evidence thereof. New immigration officers receive instruction and examination in Fourth Amendment law, and others receive periodic refresher courses in law. Brief for Petitioner 39–40. Evidence seized through intentionally unlawful conduct is excluded by Department of Justice policy from the proceeding for which it was obtained. See Memorandum from Benjamin R. Civiletti to Heads of Offices, Boards, Bureaus and Divisions, Violations of Search and Seizure Law (Jan. 16, 1981). The INS also has in place a procedure for investigating and punishing immigration officers who commit Fourth Amendment violations. See Office of General Counsel, INS, U. S. Dept. of Justice, The Law of Arrest, Search, and Seizure for Immigration Officers 35 (Jan. 1983). The INS's attention to Fourth Amendment interests cannot guarantee that constitutional violations will not occur, but it does reduce the likely deterrent value of the exclusionary rule. Deterrence must be measured at the margin.

Finally, the deterrent value of the exclusionary rule in deportation proceedings is undermined by the availability of alternative remedies for institutional practices by the INS that might violate Fourth Amendment rights. The INS is a single agency, under central federal control, and engaged in operations of broad scope but highly repetitive character. The possibility of declaratory relief against the agency thus offers a means for challenging the validity of INS practices, when standing requirements for bringing such an action can be met. Cf. *INS* v. *Delgado*, 466 U. S. 210 (1984).

Respondents contend that retention of the exclusionary rule is necessary to safeguard the Fourth Amendment rights of ethnic Americans, particularly the Hispanic-Americans lawfully in this country. We recognize that respondents raise here legitimate and important concerns. But application of the exclusionary rule to civil deportation proceedings

can be justified only if the rule is likely to add significant protection to these Fourth Amendment rights. The exclusionary rule provides no remedy for completed wrongs; those lawfully in this country can be interested in its application only insofar as it may serve as an effective deterrent to future INS misconduct. For the reasons we have discussed we conclude that application of the rule in INS civil deportation proceedings, as in the circumstances discussed in *Janis*, "is unlikely to provide significant, much less substantial, additional deterrence." 428 U. S., at 458. Important as it is to protect the Fourth Amendment rights of all persons, there is no convincing indication that application of the exclusionary rule in civil deportation proceedings will contribute materially to that end.

On the other side of the scale, the social costs of applying the exclusionary rule in deportation proceedings are both unusual and significant. The first cost is one that is unique to continuing violations of the law. Applying the exclusionary rule in proceedings that are intended not to punish past transgressions but to prevent their continuance or renewal would require the courts to close their eyes to ongoing violations of the law. This Court has never before accepted costs of this character in applying the exclusionary rule.

Presumably no one would argue that the exclusionary rule should be invoked to prevent an agency from ordering corrective action at a leaking hazardous waste dump if the evidence underlying the order had been improperly obtained, or to compel police to return contraband explosives or drugs to their owner if the contraband had been unlawfully seized. On the rare occasions that it has considered costs of this type the Court has firmly indicated that the exclusionary rule does not extend this far. See *United States* v. *Jeffers*, 342 U. S. 48, 54 (1951); *Trupiano* v. *United States*, 334 U. S. 699, 710 (1948). The rationale for these holdings is not difficult to find. "Both *Trupiano* and *Jeffers* concerned objects the possession of which, without more, constitutes a crime. The re-

possession of such *per se* contraband by Jeffers and Trupiano would have subjected them to criminal penalties. The return of the contraband would clearly have frustrated the express public policy against the possession of such objects." *One 1958 Plymouth Sedan* v. *Pennsylvania*, 380 U. S. 693, 699 (1965) (footnote omitted). Precisely the same can be said here. Sandoval-Sanchez is a person whose unregistered presence in this country, without more, constitutes a crime.[3] His release within our borders would immediately subject him to criminal penalties. His release would clearly frustrate the express public policy against an alien's unregistered presence in this country. Even the objective of deterring Fourth Amendment violations should not require such a result. The constable's blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of an ongoing crime. When the crime in question involves unlawful presence in this country, the criminal may go free, but he should not go free within our borders.[4]

---

[3] Sandoval-Sanchez was arrested on June 23, 1977. His deportation hearing was held on October 7, 1977. By that time he was under a duty to apply for registration as an alien. A failure to do so plainly constituted a continuing crime. 8 U. S. C. §§ 1302, 1306. Sandoval-Sanchez was not, of course, prosecuted for this crime, and we do not know whether or not he did make the required application. But it is safe to assume that the exclusionary rule would never be at issue in a deportation proceeding brought against an alien who entered the country unlawfully and then voluntarily admitted to his unlawful presence in an application for registration.

Sandoval-Sanchez was also not prosecuted for his initial illegal entry into this country, an independent crime under 8 U. S. C. § 1325. We need not decide whether or not remaining in this country following an illegal entry is a continuing or a completed crime under § 1325. The question is academic, of course, since in either event the unlawful entry remains both punishable and continuing grounds for deportation. See 8 U. S. C. § 1251(a)(2).

[4] Similarly, in *Sure-Tan, Inc.* v. *NLRB*, 467 U. S. 883 (1984), the Court concluded that an employer can be guilty of an unfair labor practice in his dealings with an alien notwithstanding the alien's illegal presence in this country. Retrospective sanctions against the employer may accord-

Other factors also weigh against applying the exclusionary rule in deportation proceedings. The INS currently operates a deliberately simple deportation hearing system, streamlined to permit the quick resolution of very large numbers of deportation actions, and it is against this backdrop that the costs of the exclusionary rule must be assessed. The costs of applying the exclusionary rule, like the benefits, must be measured at the margin.

The average immigration judge handles about six deportation hearings per day. Brief for Petitioner 27, n. 16. Neither the hearing officers nor the attorneys participating in those hearings are likely to be well versed in the intricacies of Fourth Amendment law. The prospect of even occasional invocation of the exclusionary rule might significantly change and complicate the character of these proceedings. The BIA has described the practical problems as follows:

> "Absent the applicability of the exclusionary rule, questions relating to deportability routinely involve simple factual allegations and matters of proof. When Fourth Amendment issues are raised at deportation hearings, the result is a diversion of attention from the main issues which those proceedings were created to resolve, both in terms of the expertise of the administrative decision makers and of the structure of the forum to accommodate inquiries into search and seizure questions. The result frequently seems to be a long, confused record in which the issues are not clearly defined and in which there is voluminous testimony . . . . The ensuing delays and inordinate amount of time spent on such cases at all levels has an adverse impact on the effective adminis-

---

ingly be imposed by the National Labor Relations Board to further the public policy against unfair labor practices. But while he maintains the status of an illegal alien, the employee is plainly not entitled to the prospective relief—reinstatement and continued employment—that probably would be granted to other victims of similar unfair labor practices.

tration of the immigration laws .... This is particularly true in a proceeding where delay may be the only 'defense' available and where problems already exist with the use of dilatory tactics." *Matter of Sandoval*, 17 I. & N., at 80 (footnote omitted).

This sober assessment of the exclusionary rule's likely costs, by the agency that would have to administer the rule in at least the administrative tiers of its application, cannot be brushed off lightly.

The BIA's concerns are reinforced by the staggering dimension of the problem that the INS confronts. Immigration officers apprehend over one million deportable aliens in this country every year. *Id.*, at 85. A single agent may arrest many illegal aliens every day. Although the investigatory burden does not justify the commission of constitutional violations, the officers cannot be expected to compile elaborate, contemporaneous, written reports detailing the circumstances of every arrest. At present an officer simply completes a "Record of Deportable Alien" that is introduced to prove the INS's case at the deportation hearing; the officer rarely must attend the hearing. Fourth Amendment suppression hearings would undoubtedly require considerably more, and the likely burden on the administration of the immigration laws would be correspondingly severe.

Finally, the INS advances the credible argument that applying the exclusionary rule to deportation proceedings might well result in the suppression of large amounts of information that had been obtained entirely lawfully. INS arrests occur in crowded and confused circumstances. Though the INS agents are instructed to follow procedures that adequately protect Fourth Amendment interests, agents will usually be able to testify only to the fact that they followed INS rules. The demand for a precise account of exactly what happened in each particular arrest would plainly preclude mass arrests, even when the INS is confronted,

as it often is, with massed numbers of ascertainably illegal aliens, and even when the arrests can be and are conducted in full compliance with all Fourth Amendment requirements.

In these circumstances we are persuaded that the *Janis* balance between costs and benefits comes out against applying the exclusionary rule in civil deportation hearings held by the INS. By all appearances the INS has already taken sensible and reasonable steps to deter Fourth Amendment violations by its officers, and this makes the likely additional deterrent value of the exclusionary rule small. The costs of applying the exclusionary rule in the context of civil deportation hearings are high. In particular, application of the exclusionary rule in cases such as Sandoval-Sanchez', would compel the courts to release from custody persons who would then immediately resume their commission of a crime through their continuing, unlawful presence in this country. "There comes a point at which courts, consistent with their duty to administer the law, cannot continue to create barriers to law enforcement in the pursuit of a supervisory role that is properly the duty of the Executive and Legislative Branches." *United States* v. *Janis*, 428 U. S., at 459. That point has been reached here.

## V

We do not condone any violations of the Fourth Amendment that may have occurred in the arrests of respondents Lopez-Mendoza or Sandoval-Sanchez. Moreover, no challenge is raised here to the INS's own internal regulations. Cf. *INS* v. *Delgado*, 466 U. S. 210 (1984). Our conclusions concerning the exclusionary rule's value might change, if there developed good reason to believe that Fourth Amendment violations by INS officers were widespread. Cf. *United States* v. *Leon*, *ante*, at 928 (BLACKMUN, J., concurring). Finally, we do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine

the probative value of the evidence obtained.[5]   Cf. *Rochin* v. *California*, 342 U. S. 165 (1952).   At issue here is the exclusion of credible evidence gathered in connection with peaceful arrests by INS officers.   We hold that evidence derived from such arrests need not be suppressed in an INS civil deportation hearing.

The judgment of the Court of Appeals is therefore

*Reversed.*

JUSTICE BRENNAN, dissenting.

I fully agree with JUSTICE WHITE that under the analysis developed by the Court in such cases as *United States* v. *Janis*, 428 U. S. 433 (1976), and *United States* v. *Calandra*, 414 U. S. 338 (1974), the exclusionary rule must apply in civil deportation proceedings.   However, for the reasons set forth today in my dissenting opinion in *United States* v. *Leon*, *ante*, p. 897, I believe the basis for the exclusionary rule does not derive from its effectiveness as a deterrent, but is instead found in the requirements of the Fourth Amendment itself.   My view of the exclusionary rule would, of course, require affirmance of the Court of Appeals.   In this case, federal law enforcement officers arrested respondents Sandoval-Sanchez and Lopez-Mendoza in violation of their Fourth Amendment rights.   The subsequent admission of any evidence secured pursuant to these unlawful arrests

---

[5] We note that subsequent to its decision in *Matter of Sandoval*, 17 I. & N. Dec. 70 (1979), the BIA held that evidence will be excluded if the circumstances surrounding a particular arrest and interrogation would render use of the evidence obtained thereby "fundamentally unfair" and in violation of due process requirements of the Fifth Amendment.   *Matter of Toro*, 17 I. &. N. Dec. 340, 343 (1980).   See also *Matter of Garcia*, 17 I. & N. Dec. 319, 321 (1980) (suppression of admission of alienage obtained after request for counsel had been repeatedly refused); *Matter of Ramira-Cordova*, No. A21 095 659 (Feb. 21, 1980) (suppression of evidence obtained as a result of a nighttime warrantless entry into the aliens' residence).

in civil deportation proceedings would, in my view, also infringe those rights. The Government of the United States bears an obligation to obey the Fourth Amendment; that obligation is not lifted simply because the law enforcement officers were agents of the Immigration and Naturalization Service, nor because the evidence obtained by those officers was to be used in civil deportation proceedings.

JUSTICE WHITE, dissenting.

The Court today holds that the exclusionary rule does not apply in civil deportation proceedings. Because I believe that the conclusion of the majority is based upon an incorrect assessment of the costs and benefits of applying the rule in such proceedings, I respectfully dissent.[1]

The paradigmatic case in which the exclusionary rule is applied is when the prosecutor seeks to use evidence illegally obtained by law enforcement officials in his case in chief in a criminal trial. In other classes of cases, the rule is applicable only when the likelihood of deterring the unwanted conduct outweighs the societal costs imposed by exclusion of relevant evidence. *United States* v. *Janis*, 428 U. S. 433, 454 (1976). Thus, the Court has, in a number of situations, refused to extend the exclusionary rule to proceedings other than the criminal trial itself. For example, in *Stone* v. *Powell*, 428 U. S. 465 (1976), the Court held that the deterrent effect of the rule would not be reduced by refusing to allow a state prisoner to litigate a Fourth Amendment claim in federal habeas corpus proceedings if he was afforded a full and fair opportunity to litigate it in state court. Similarly, in *United*

---

[1] I also question the Court's finding that Lopez-Mendoza failed to object to admission of the evidence. *Ante,* at 1040, and n. 1. The Court of Appeals held that he had made a proper objection, 705 F. 2d 1059, 1060, n. 1 (CA9 1983), and the INS did not seek review of that conclusion, Brief for Petitioner 8, n. 8. Moreover, the fact that changes in an opinion are made between the time of the slip opinion and the bound volume has never before been considered evidence that the holding of a case is "unsettled." See *ante,* at 1040, n. 1.

*States* v. *Calandra*, 414 U. S. 338, 351 (1974), we concluded that "[a]ny incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best." And in *United States* v. *Janis, supra,* we declined to extend the exclusionary rule to bar the introduction in a federal civil proceeding of evidence unconstitutionally seized by a state law enforcement officer. In all of these cases it was unquestioned that the illegally seized evidence would not be admissible in the case in chief of the proceeding for which the evidence was gathered; only its collateral use was permitted.

Civil deportation proceedings are in no sense "collateral." The majority correctly acknowledges that the "primary objective" of the INS agent is "to use evidence in the civil deportation proceeding" and that "the agency officials who effect the unlawful arrest are the same officials who subsequently bring the deportation action." *Ante*, at 1043. The Immigration and Naturalization Service likewise concedes that INS agents are "in the business of conducting searches for and seizures of illegal aliens for the purpose of bringing about their deportation." Brief for Petitioner 37. Thus, unlike the situation in *Janis*, the conduct challenged here falls within "the offending officer's zone of primary interest." 428 U. S., at 458. The majority nonetheless concludes that application of the rule in such proceedings is unlikely to provide significant deterrence. Because INS agents are law enforcement officials whose mission is closely analogous to that of police officers and because civil deportation proceedings are to INS agents what criminal trials are to police officers, I cannot agree with that assessment.

The exclusionary rule rests on the Court's belief that exclusion has a sufficient deterrent effect to justify its imposition, and the Court has not abandoned the rule. As long as that is the case, there is no principled basis for distinguishing between the deterrent effect of the rule in criminal cases and in civil deportation proceedings. The majority attempts to justify the distinction by asserting that deportation will still

be possible when evidence not derived from the illegal search or seizure is independently sufficient. *Ante,* at 1043–1044. However, that is no less true in criminal cases. The suppression of some evidence does not bar prosecution for the crime, and in many cases even though some evidence is suppressed a conviction will nonetheless be obtained.

The majority also suggests that the fact that most aliens elect voluntary departure dilutes the deterrent effect of the exclusionary rule, because the infrequency of challenges to admission of evidence will mean that "the consequences from the point of view of the officer's overall arrest and deportation record will be trivial." *Ante,* at 1044. It is true that a majority of apprehended aliens elect voluntary departure, while a lesser number go through civil deportation proceedings and a still smaller number are criminally prosecuted. However, that fact no more diminishes the importance of the exclusionary sanction than the fact that many criminal defendants plead guilty dilutes the rule's deterrent effect in criminal cases. The possibility of exclusion of evidence quite obviously plays a part in the decision whether to contest either civil deportation or criminal prosecution. Moreover, in concentrating on the incentives under which the individual agent operates to the exclusion of the incentives under which the agency as a whole operates neglects the "systemic" deterrent effect that may lead the agency to adopt policies and procedures that conform to Fourth Amendment standards. See, *e. g., Dunaway* v. *New York,* 442 U. S. 200, 221 (1979) (STEVENS, J., concurring).

The majority believes "perhaps most important" the fact that the INS has a "comprehensive scheme" in place for deterring Fourth Amendment violations by punishing agents who commit such violations, but it points to not a single instance in which that scheme has been invoked.[2] *Ante,* at

---

[2] The INS suggests that its disciplinary rules are "not mere paper procedures" and that over a period of four years 20 officers were suspended or terminated for misconduct toward aliens. Brief for Petitioner 45, n. 28. The INS does not assert, however, that any of these officers were disci-

1044–1045. Also, immigration officers are instructed and examined in Fourth Amendment law, and it is suggested that this education is another reason why the exclusionary rule is unnecessary. *Ibid.* A contrary lesson could be discerned from the existence of these programs, however, when it is recalled that they were instituted during "a legal regime in which the cases and commentators uniformly sanctioned the invocation of the rule in deportation proceedings." 705 F. 2d 1059, 1071 (CA9 1983). Thus, rather than supporting a conclusion that the exclusionary rule is unnecessary, the existence of these programs instead suggests that the exclusionary rule has created incentives for the agency to ensure that its officers follow the dictates of the Constitution. Since the deterrent function of the rule is furthered if it alters either "the behavior of individual law enforcement officers or the policies of their departments," *United States* v. *Leon, ante,* at 918, it seems likely that it was the rule's deterrent effect that led to the programs to which the Court now points for its assertion that the rule would have no deterrent effect.

The suggestion that alternative remedies, such as civil suits, provide adequate protection is unrealistic. Contrary to the situation in criminal cases, once the Government has improperly obtained evidence against an illegal alien, he is removed from the country and is therefore in no position to file civil actions in federal courts. Moreover, those who are legally in the country but are nonetheless subjected to illegal searches and seizures are likely to be poor and uneducated, and many will not speak English. It is doubtful that the threat of civil suits by these persons will strike fear into the hearts of those who enforce the Nation's immigration laws.

It is also my belief that the majority exaggerates the costs associated with applying the exclusionary rule in this context. Evidence obtained through violation of the Fourth Amendment is not automatically suppressed, and any inquiry

plined for Fourth Amendment violations, and it appears that the 11 officers who were terminated were terminated for rape or assault. See Brief for Respondents 60, n. 42.

into the burdens associated with application of the exclusionary rule must take that fact into account. In *United States* v. *Leon, ante,* p. 897, we have held that the exclusionary rule is not applicable when officers are acting in objective good faith. Thus, if the agents neither knew nor should have known that they were acting contrary to the dictates of the Fourth Amendment, evidence will not be suppressed even if it is held that their conduct was illegal.

As is noted *ante,* at 1051, n. 5, the BIA has already held that evidence will be suppressed if it results from egregious violations of constitutional standards. Thus, the mechanism for dealing with suppression motions exists and is utilized, significantly decreasing the force of the majority's predictions of dire consequences flowing from "even occasional invocation of the exclusionary rule." *Ante,* at 1048. Although the standard currently utilized by the BIA may not be precisely coextensive with the good-faith exception, any incremental increase in the amount of evidence that is suppressed through application of *Leon* is unlikely to be significant. Likewise, any difference that may exist between the two standards is unlikely to increase significantly the number of suppression motions filed.

Contrary to the view of the majority, it is not the case that Sandoval-Sanchez' "unregistered presence in this country, without more, constitutes a crime." *Ante,* at 1047. Section 275 of the Immigration and Nationality Act makes it a crime to enter the United States illegally. 8 U. S. C. § 1325.[3] The first offense constitutes a misdemeanor, and subsequent offenses constitute felonies. *Ibid.* Those few cases that have construed this statute have held that a violation takes

---

[3] Section 275 provides in part:

"Any alien who (1) enters the United States at any time or place other than as designated by immigration officers, or (2) eludes examination or inspection by immigration officers, or (3) obtains entry to the United States by a willfully false or misleading representation . . . shall be guilty of a [crime]. . . ." 8 U. S. C. § 1325.

place at the time of entry and that the statute does not describe a continuing offense. *Gonzales* v. *City of Peoria*, 722 F. 2d 468, 473–474 (CA9 1983); *United States* v. *Rincon-Jimenez*, 595 F. 2d 1192, 1194 (CA9 1979). Although this Court has not construed the statute, it has suggested in dictum that this interpretation is correct, *United States* v. *Cores*, 356 U. S. 405, 408, n. 6 (1958), and it is relatively clear that such an interpretation is most consistent with the statutory language. Therefore, it is simply not the case that suppressing evidence in deportation proceedings will "allo[w] the criminal to continue in the commission of an ongoing crime." *Ante*, at 1047. It is true that some courts have construed § 276 of the Act, 8 U. S. C. § 1326, which applies to aliens previously deported who enter or are found in the United States, to describe a continuing offense.[4] *United States* v. *Bruno*, 328 F. Supp. 815 (WD Mo. 1971); *United States* v. *Alvarado-Soto*, 120 F. Supp. 848 (SD Cal. 1954); *United States* v. *Rincon-Jimenez*, *supra* (dictum). But see *United States* v. *DiSantillo*, 615 F. 2d 128 (CA3 1980). In such cases, however, the Government will have a record of the prior deportation and will have little need for any evidence that might be suppressed through application of the exclusionary rule. See *United States* v. *Pineda-Chinchilla*, 712 F. 2d 942 (CA5 1983) (illegality of arrest does not bar introduction of INS records to demonstrate prior deportation), cert. denied, 464 U. S. 964 (1983).

Although the majority relies on the registration provisions of 8 U. S. C. §§ 1302 and 1306 for its "continuing crime" argument, those provisions provide little support for the general

---

[4] Section 276 provides in part:

"Any alien who—

"(1) has been arrested and deported or excluded and deported, and thereafter

"(2) enters, attempts to enter, or is at any time found in, the United States . . .

shall be guilty of a felony." 8 U. S. C. § 1326.

rule laid down that the exclusionary rule does not apply in civil deportation proceedings. First, § 1302 requires that aliens register within 30 days of entry into the country. Thus, for the first 30 days failure to register is not a crime. Second, § 1306 provides that only *willful* failure to register is a misdemeanor. Therefore, "unregistered presence in this country, without more," *ante,* at 1047, does not constitute a crime; rather, unregistered presence plus willfulness must be shown. There is no finding that Sandoval-Sanchez willfully failed to register, which is a necessary predicate to the conclusion that he is engaged in a continuing crime. Third, only aliens 14 years of age or older are required to register; those under 14 years of age are to be registered by their parents or guardian. By the majority's reasoning, therefore, perhaps the exclusionary rule should apply in proceedings to deport children under 14, since their failure to register does not constitute a crime.

Application of the rule, we are told, will also seriously interfere with the "streamlined" nature of deportation hearings because "[n]either the hearing officers nor the attorneys participating in those hearings are likely to be well versed in the intricacies of Fourth Amendment law." *Ante,* at 1048. Yet the majority deprecates the deterrent benefit of the exclusionary rule in part on the ground that immigration officers receive a thorough education in Fourth Amendment law. *Ante,* at 1044–1045. The implication that hearing officers should defer to law enforcement officers' superior understanding of constitutional principles is startling indeed.

Prior to the decision of the Board of Immigration Appeals in *Matter of Sandoval,* 17 I. & N. Dec. 70 (1979), neither the Board nor any court had held that the exclusionary rule did not apply in civil deportation proceedings. 705 F. 2d, at 1071. The Board in *Sandoval* noted that there were "fewer than fifty" BIA proceedings since 1952 in which motions had been made to suppress evidence on Fourth Amendment

grounds. This is so despite the fact that "immigration law practitioners have been informed by the major treatise in their field that the exclusionary rule was available to clients facing deportation. *See* 1A C. Gordon and H. Rosenfield, Immigration Law and Procedure § 5.2c at 5–31 (rev. ed. 1980)." 705 F. 2d, at 1071. The suggestion that "[t]he prospect of even occasional invocation of the exclusionary rule might significantly change and complicate the character of these proceedings," *ante*, at 1048, is thus difficult to credit. The simple fact is that prior to 1979 the exclusionary rule was available in civil deportation proceedings, and there is no indication that it significantly interfered with the ability of the INS to function.

Finally, the majority suggests that application of the exclusionary rule might well result in the suppression of large amounts of information legally obtained because of the "crowded and confused circumstances" surrounding mass arrests. *Ante*, at 1049. The result would be that INS agents would have to keep a "precise account of exactly what happened in each particular arrest," which would be impractical considering the "massed numbers of ascertainably illegal aliens." *Ante*, at 1049–1050. Rather than constituting a rejection of the application of the exclusionary rule in civil deportation proceedings, however, this argument amounts to a rejection of the application of the Fourth Amendment to the activities of INS agents. If the pandemonium attending immigration arrests is so great that violations of the Fourth Amendment cannot be ascertained for the purpose of applying the exclusionary rule, there is no reason to think that such violations can be ascertained for purposes of civil suits or internal disciplinary proceedings, both of which are proceedings that the majority suggests provide adequate deterrence against Fourth Amendment violations. The Court may be willing to throw up its hands in dismay because it is administratively inconvenient to determine whether

constitutional rights have been violated, but we neglect our duty when we subordinate constitutional rights to expediency in such a manner. Particularly is this so when, as here, there is but a weak showing that administrative efficiency will be seriously compromised.

In sum, I believe that the costs and benefits of applying the exclusionary rule in civil deportation proceedings do not differ in any significant way from the costs and benefits of applying the rule in ordinary criminal proceedings. Unless the exclusionary rule is to be wholly done away with and the Court's belief that it has deterrent effects abandoned, it should be applied in deportation proceedings when evidence has been obtained by deliberate violations of the Fourth Amendment or by conduct a reasonably competent officer would know is contrary to the Constitution. Accordingly, I dissent.

JUSTICE MARSHALL, dissenting.

I agree with JUSTICE WHITE that application to this case of the mode of analysis embodied in the decisions of the Court in *United States* v. *Janis,* 428 U. S. 433 (1976), and *United States* v. *Calandra,* 414 U. S. 338 (1974), compels the conclusion that the exclusionary rule should apply in civil deportation proceedings. *Ante,* at 1052–1054. However, I continue to believe that that mode of analysis fails to reflect the constitutionally mandated character of the exclusionary rule. See *United States* v. *Leon, ante,* at 931–938 (BRENNAN, J., joined by MARSHALL, J., dissenting); *United States* v. *Janis, supra,* at 460 (BRENNAN, J., joined by MARSHALL, J., dissenting). In my view, a sufficient reason for excluding from civil deportation proceedings evidence obtained in violation of the Fourth Amendment is that there is no other way to achieve "the twin goals of enabling the judiciary to avoid the taint of partnership in official lawlessness and of assuring the people—all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining

popular trust in government." *United States* v. *Calandra*, *supra*, at 357 (BRENNAN, J., joined by MARSHALL, J., dissenting).

JUSTICE STEVENS, dissenting.

Because the Court has not yet held that the rule of *United States* v. *Leon, ante,* p. 897, has any application to warrantless searches, I do not join the portion of JUSTICE WHITE's opinion that relies on that case.   I do, however, agree with the remainder of his dissenting opinion.