**UNITED STATES OF AMERICA, Plaintiff**
**v.**
**GARY BOWLEY, Defendant**
**UNITED STATES v. BOWLEY**
Crim. No. 2004/0169

District Court of the Virgin Islands

Division of St. Thomas and St. John

June 8, 2005

KIM CHISHOLM, ESQ., Assistant United States Attorney, Office of the U.S. Attorney, St. Thomas, U.S.V.I., *Attorney for the United States of America.*

PATRICIA SCHRADER-COOKE, ESQ., Assistant Federal Public Defender, St. Thomas, U.S.V.I., *Attorney for Defendant Gary Bowley.*

FINCH, *Chief Judge*

## MEMORANDUM OPINION

(June 8, 2005)

THIS MATTER comes before the Court on what the Court will refer to as the Government's Motion to Reconsider its previous decision of March 14, 2005 suppressing certain evidence. A hearing was held on such motion on May 11, 2005, after jury selection.

### I. The Facts

The following facts relevant to this Motion to Reconsider were adduced at the evidentiary hearing held March 9, 2005. Bernard Hendricks, with the Virgin Islands Police Department (VIPD) was involved in investigating a series of armed robberies in the Coral Bay area of St. John. Tr., p.16, 1.12-15. He learned from confidential informants that Defendant was believed to be involved in these robberies and was also involved in drug dealing, and what Sgt. Hendricks referred to as several illegal activities. Tr., p.16, 1.20-25; p.17, 1.5-7.

Sgt. Hendricks and another VIPD officer learned where Defendant was residing, went to his home in a police vehicle, and blew the horn. Tr., p.18, 1.15-16; p.19, 1.15-17. Defendant came out of the house and the police questioned him. Tr., p.18, 1.17-24. In particular, the police asked him if he had any documents that would show that he was legally present in the United States. Tr., p.18, 1.23-25; p.23, 1.2-4. Defendant admitted that he had entered illegally and provided identification documents showing his photograph and indicating this [sic] his name was Junior Anthony Miller. Tr., p.19, 1.1-2; p.36, 1.1-7.

Defendant was handcuffed and transported to the police station where he was placed in a cell. Tr., p.23, 1.8; p.24, 1.1. Some time later that day, the Office of Immigration and Customs Enforcement (ICE) was contacted. Tr., p.24, 1.27; p.25, 1.5. The following day, Defendant and two other illegal aliens were taken to St. Thomas for processing and for investigation of their immigration status. Tr., p.29, 1.5-10.

A Special Agent for ICE explained that processing means the setting up of a hearing before an immigration judge to determine whether the individual can lawfully remain in the United States. Tr., p.30, 1.10-16. As to the procedures involved in investigating the immigration status of the aliens, the Special Agent testified:

Q. Did you investigate their immigration status at the Nisky Center?

A. Yes, we did.

Q. Okay. Tell us what you did with respect to the defendant who is seated in the courtroom today?

A. ICE, Immigration and Customs Enforcement, has a database. This database is based on a fingerprint impression, that uses a laser scanner to take a fingerprint impression. And we tool all three subjects and we entered them into that database by the fingerprint scanner. ...

...

A. The defendant, he had a hit, an alert from an encounter. I can't remember the date, I can't remember the date of the encounter. It was a prior encounter and a prior removal.

Q. And the hit that he had, that was based on scanning a fingerprint through your IDENT system?

A. Yes. His fingerprint was entered into that, into that system through a laser scanner, and that's how it's used to determine prior, prior encounters and prior alerts.

Tr., p.30, 1.17 - p. 31, 1.20.

Thus, to determine whether any of the three illegal aliens had any prior encounters with the ICE and the nature of such encounters, the Special Agent took fingerprint impressions using a laser scanning technique. The fingerprint impressions were matched with the ICE database. Using this methodology, ICE learned that Defendant had provided them with an alias and that he had, in fact, been previously deported.

## II. The Government's Position

In its decision of March 14, 2005, the Court denied suppression of the statements that Defendant made, or the documents that he produced, at his residence. The Court suppressed any and all evidence obtained after Defendant was handcuffed, placed in the police vehicle, taken to the police station and held in a cell, because the Virgin Islands police officers did not have probable cause to arrest him. The Government does not challenge the Court's decision to suppress, but argues that certain evidence cannot be suppressed.

Defendant has been charged in a single-count Information with illegally entering the United States after deportation and removal in violation of 8 U.S.C. § 1326(a) and (b)(2). To prove this crime, the Government must prove that Defendant was previously deported and that he is illegally present in the United States.

The Government has proffered that if Defendant's identity is admissible, it can show that he was previously deported using Defendant's immigration file. The Government argues that Defendant's identity cannot be suppressed, relying on *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039, 82 L. Ed. 2d 778, 104 S. Ct. 3479 (1984) and cases from the Fifth and Ninth Circuits interpreting *Lopez-Mendoza—United States v. Guzman-Bruno*, 27 F.3d 420 (9th Cir. 1994) and *United States v. Roque-Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999), respectively.

If the fingerprint impressions were not fruit of the poisonous tree, then Defendant's identity would be admissible. The Government suggests that since, unlike the VIPD, the ICE had the authority to hold the Defendant, the fingerprint identification is not fruit of the poisonous tree. Alternatively, the Government contends that because the fingerprint impressions were obtained as part of ICE's normal administrative processing they were not taken for the purposes of investigation, and therefore should not be suppressed.

Finally, the Government proffers that it can procure the testimony of the federal agents who will identify Defendant as the individual that they previously assisted in deporting to Jamaica. The Government gleaned the names of such federal agents using the identity information obtained from the fingerprint impressions.

### III. Analysis

The Court is not convinced that the Supreme Court broadly held in *Lopez-Mendoza* that a defendant's identity cannot be suppressed in a criminal matter. The Supreme Court ruled that a defendant's body and identity cannot be suppressed only in the sense that even a defendant whose identity is discovered through unconstitutional means may be physically brought to trial and tried under his or her true name. *See United States v. Guevara-Martinez*, 262 F.3d 751, 754 (8th Cir. 2001). "*Lopez-Mendoza* does not preclude suppression of evidence unlawfully obtained from a suspect that may in a criminal investigation establish the identity of the suspect." *United States v. Garcia-Beltran*, 389 F.3d 864,

867 (9th Cir. 2004). Under "the general rule of criminal procedure" "that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible," the elements of the charged crime, including Defendant's identity, must be proved using untainted evidence. *Lopez-Mendoza,* 468 U.S. at 1040; *United States v. Rodriguez-Arreola,* 270 F.3d 611, 619 (8th Cir. 2001) (holding that "under *Lopez-Mendoza,* the government would not be prohibited from prosecuting Rodriguez for violating § 1326 so long as it used *untainted* evidence of his identity"). Thus, even after considering *Lopez-Mendoza* and the cases from the Court of Appeals construing it, the Court sees no reason for altering its decision suppressing Defendant's identity for the purpose of proving that he was previously deported.

■ As to the Government's argument that the fingerprint impressions should not have been suppressed because the ICE, which had the authority to arrest Defendant, took Defendant's fingerprint impressions, the Government overlooks that the ICE's custody of Defendant is nonetheless fruit of the poisonous tree for the purposes of a criminal prosecution. If the VIPD had not arrested Defendant, but rather relayed what they had learned to the ICE, the ICE could have arrested Defendant for his illegal status without violating his constitutional rights, in which case his fingerprint impressions would not have been subject to suppression. Instead, the VIPD arrested Defendant in violation of his Fourth Amendment rights and delivered Defendant to the ICE. The ICE's custody of Defendant is clearly a fruit of the preceding illegal arrest by the VIPD. Since ICE's arrest of Defendant was fruit of the poisonous tree, any evidence obtained by the ICE is also fruit of the poisonous tree, including Defendant's fingerprint impressions and identification derived from his fingerprint impressions, unless an exception to that poisonous tree doctrine applies. *See United States v. Olivares-Rangel,* 324 F. Supp. 2d 1218, 1224 (D.N.M. 2004) (suppressing name, fingerprints, and agents' knowledge of his presence in the United States, and precluding such identity information from being used to prove defendant's present in the United States or to tie him to his criminal and immigration records).

■ The inevitable discovery exception, recognized by the Supreme Court in *Nix v. Williams,* 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984) does not apply because an ICE arrest of Defendant was not inevitable even after the VIPD learned that he was present in the United

States illegally. Defendant could have evaded detection by the ICE, if he had not been arrested by the VIPD. *Cf. United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1400 (9th Cir. 1989) (finding inevitable discovery exception inapplicable since immigration status of individuals may not have been discovered if illegal search had not occurred).

Courts distinguish between fingerprint evidence that is obtained as part of a routine booking procedure and fingerprints that are obtained for investigative purposes. *See Garcia-Beltran*, 389 F.3d at 867-68; *Guevara-Martinez*, 262 F.3d at 756. If the fingerprints are obtained as part of a routine booking procedure, the fingerprints are sufficiently unrelated to the unlawful arrest that they are untainted. *Guevara-Martinez*, 262 F.3d at 756. However, if they are motivated by "an INS-related purpose," they likely are fruit of the poisonous tree. *Id.*

An ICE Special Agent testified concerning the purpose of obtaining the fingerprint impressions. He distinguished processing, which referred to arranging for a hearing before an immigration judge, from investigation of an individual's immigration status, which involved obtaining fingerprint impressions through a laser scanning technique to compare such impressions with a database.

After reviewing such testimony, the Court disagrees with the Government's position concerning the purpose of obtaining the fingerprint impressions. The fingerprint impressions were taken to investigative Defendant's immigration status and therefore are not admissible to prove Defendant's identity. The fingerprint check was performed to determine whether Defendant had any prior encounters with the ICE. Because the VIPD delivered Defendant to the ICE, and his fingerprint impressions were obtained immediately, there is no attenuation between Defendant's unlawful detention and his fingerprint identification. *See Olivares-Rangel*, 324 F. Supp. 2d at 1223 (finding identification and fingerprints to be fruit of poisonous tree when no intervening events between illegal arrest and obtaining incriminating evidence). Thus, the Government has not sustained its burden of proof of showing that the fingerprint impressions were taken as part of a routine processing, rather than for the purpose of pursuing INS-related proceedings against him.

Finally, the Government cannot use the illegally-obtained identify evidence to prove that Defendant was previously deported from the United States. The Government proffers that the federal agents who previously assisted in the deportation of Defendant to Jamaica can

identify Defendant as the person previously deported. However, the Government used Defendant's identity, which was obtained illegally through his fingerprint impressions, to locate these federal agents. *Cf. United States v. Crews,* 445 U.S. 463, 471-472, 63 L. Ed. 2d 537, 100 S. Ct. 1244 (1980) (allowing in-court identification, noting "this is not a case in which the witness' identity was discovered or her cooperation secured only as a result of an unlawful search or arrest of the accused"). Therefore, such testimony is also fruit of the poisonous tree. *See Olivares-Rangel,* 324 F. Supp. 2d at 1224 (reasoning that because defendant was illegally detained before agent of Department of Customs and Border Protection obtained any incriminating evidence, identity evidence that was unlawfully seized could not be used to prove defendant's presence in the United States).

## IV. Conclusion

The Court previously suppressed the Defendant's fingerprint impressions and identity for the purpose of proving that he was illegally present in the United States after re-entry following deportation in its decision on March 14, 2005. The Government has, in essence, moved for reconsideration of this determination on various grounds. After considering such grounds, the Court maintains that the challenged evidence, Defendant's fingerprint impressions and identity, must be suppressed as obtained in violation of his Fourth Amendment rights.