In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1026

ZINOVIY KRASILYCH,

*Petitioner,*

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an
Order of the Board of Immigration Appeals.
No. A 077 656 426

SUBMITTED SEPTEMBER 16, 2009*—DECIDED SEPTEMBER 29, 2009

Before FLAUM, EVANS, and SYKES, *Circuit Judges.*

PER CURIAM.  The Department of Homeland Security initiated removal proceedings against Zinoviy Krasilych, a Ukranian citizen, for remaining in the United States

---

* On May 12, 2009, we granted a motion from Petitioner Zinoviy Krasilych to waive oral argument. Thus, the petition for review is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2).

past the expiration of his visa. Krasilych denied that his presence was unlawful, but an immigration judge ("IJ") concluded otherwise and ordered Krasilych removed to the Ukraine. The Board of Immigration Appeals ("BIA") upheld that decision. Krasilych petitions this court for review, and we deny the petition.

Krasilych entered the United States on a three-month tourist visa in June 1998 and overstayed. More than two years later, on October 11, 2000, Krasilych visited a storefront called "G.S. Golden Travel" on Chicago's Belmont Avenue for a meeting with officer Clarence Robinson, an immigration employee. Krasilych was accompanied by Jan Mikas, the man who arranged the meeting (and whom, Krasilych says, he believed was a lawyer). With Robinson's help, Krasilych completed an INS form I-485, the application to adjust status to lawful permanent resident. At the close of the meeting, Robinson marked Krasilych's Ukranian passport with an authentic I-551 stamp, which typically serves as temporary proof that an applicant has been approved for permanent-resident status and is awaiting a permanent-resident card (commonly known as a "green card"). *See Sharkey v. Quarantillo*, 541 F.3d 75, 80 n.4 (2d Cir. 2008). The stamp on Krasilych's passport reads: "Processed for I-551. Temporary Evidence of Lawful Admission for Permanent Residence. Valid Until 10/11/2001. Employment Authorized." Robinson told Krasilych that, if asked by authorities, he should say his application for adjustment of status was granted because his brother is a United States citizen. Krasilych does not have a brother, and he told the officer so but nevertheless accepted the stamp.

About a year later Krasilych received from immigration authorities in Lincoln, Nebraska, a letter stating that his application for permanent residence was being processed, but he never received a green card. Nor did he ever get an updated I-551 stamp in his passport even after the existing stamp expired in October 2001. In fact, he heard nothing more from immigration authorities until September 29, 2005, almost five years later, when Special Agent Randy Beckwith from Immigration and Customs Enforcement ("ICE") served him with a Notice to Appear for removal proceedings, charging him with remaining in the country longer than permitted, *see* 8 U.S.C. 1227(a)(1)(B). At a hearing before the IJ, Krasilych admitted through counsel that he is a Ukrainian citizen and had entered the United States in June 1998 with permission to remain for only three months. But Krasilych denied that he was in the country unlawfully and, pointing to the temporary I-551 stamp on his passport, insisted that he had become a lawful permanent resident.

What Krasilych didn't yet know was that his Belmont Avenue meeting with Robinson had ensnared him in "Operation Durango," a three-year undercover investigation coordinated by immigration authorities, the FBI, and the Social Security Administration, targeting the fraudulent procurement of immigration benefits. At Krasilych's removal hearing in April 2007, Special Agent Beckwith—who was responsible for issuing Notices to Appear and locating suspects from the investigation—testified that investigators had opened storefront "travel agencies" where aliens went, either on their own initiative or with help from a crooked middleman like

Jan Mikas, to meet with corrupt immigration employees who could be paid off for genuine documentation. *See generally United States v. Wantuch*, 525 F.3d 505, 508 (7th Cir. 2008) (describing "Operation Golden Schemes," another undercover investigation operating from the same "G.S. Golden Travel" storefront); *Skorusa v. Gonzales*, 482 F.3d 939, 940-41 (7th Cir. 2007) (describing Operation Durango). The immigration employees at the storefronts, however, were actually undercover agents, and in virtually all cases, Beckwith testified, the alien had no legitimate basis for lawful status, and so the undercover agent would give the alien a cover story—usually that he or she had a sponsoring sibling—to use in the event that authorities questioned the alien about his or her status. The I-551 stamp placed on the alien's passport was real; an identical stamp would have been used if the alien had obtained status through legitimate means, and, according to Beckwith, some aliens caught up in Operation Durango had even left the country and returned using their stamped passports to gain readmission. Beckwith added, though, that immigration authorities had tolerated the use of these fraudulently obtained I-551 stamps only long enough to "provide a legitimacy to the operation"; authorities had never actually issued a green card or processed an application for permanent residence from an alien involved in the investigation.

Also testifying at the removal hearing was Clarence Robinson, the undercover agent who played the role of corrupt green-card adjudicator during Operation Durango. Robinson testified that aliens, believing they

were "bypassing the system" and procuring a genuine green card, would typically pay him $5,000 at the conclusion of an interview. Robinson recalled that near the end of his meeting with Krasilych and Mikas, they had briefly left the room, and, when they returned, Mikas had handed over $5,000 in currency. It is unclear from the record whether criminal charges were ever lodged against Krasilych, but Mikas pleaded guilty and was sentenced in 2004 on federal charges—stemming from the events of October 11, 2000—of bribing a public official and conspiracy to defraud the United States.

Krasilych asked the IJ to exclude any evidence gathered during Operation Durango. Citing our decision in *Pieniazek v. Gonzales*, 449 F.3d 792 (7th Cir. 2006), Krasilych argued that, in order to submit evidence from Operation Durango, the government was required to prove that the investigation had complied with the Attorney General's Guidelines on INS Undercover Operations. These guidelines specify, among other things, how and by whom a proposed undercover investigation must be approved. *See* United States Attorneys' Manual, tit. 9, §§ 1901-1906. Although the government had submitted a signature sheet from the Operation Durango proposal evidencing prior approval by the local and regional directors of the former INS, Krasilych demanded that the entire proposal be produced and, if not, that the evidence be suppressed. Without that evidence, Krasilych argued, there was no proof that the I-551 stamp on his passport had been fraudulently obtained and that he was not in fact a lawful permanent resident. But even with the evidence, he argued, he had never given

money directly to Robinson, so the stamp had been applied "gratuitously" and was thus a legitimate conferral of permanent-resident status.

The IJ rejected Krasilych's arguments. First, the IJ explained, he was satisfied that the Attorney General's guidelines had been followed, but, even if they had not, Krasilych was not entitled to have any evidence suppressed. And, in any event, the IJ continued, an I-551 stamp in a passport does not make a lawful permanent resident of someone who, like Krasilych, was never even eligible for that status. The IJ thus concluded that Krasilych was not lawfully present and, because Krasilych had not requested any form of relief, ordered him removed. The BIA agreed with the IJ's reasoning and dismissed Krasilych's appeal.

Where, as here, the BIA issues its own opinion and does not expressly adopt the IJ's findings, we review the BIA's decision. *See Xiao v. Mukasey*, 547 F.3d 712, 717 (7th Cir. 2008). We review the agency's legal conclusions de novo, *Sankoh v. Mukasey*, 539 F.3d 456, 465 (7th Cir. 2008), and we will uphold the agency's factual determinations so long as they are supported by substantial evidence, *Krishnapillai v. Holder*, 563 F.3d 606, 615 (7th Cir. 2009).

In his petition for review, Krasilych renews his argument that the evidence from the undercover investigation should have been excluded from his removal proceedings. As he argued before the IJ and the BIA, Krasilych insists that we held in *Pieniazek* that evidence gathered from Operation Durango must be suppressed if

the government does not prove that the investigation adhered to the Attorney General's Guidelines for INS Undercover Operations. This is a mischaracterization of our holding. *Pieniazek* involved an alien who, like Krasilych, had become involved in Operation Durango, and the government had used evidence gathered during that operation to support a charge of removability. 449 F.3d at 793. At the time of his removal hearing, the alien had a request pending with DHS under the Freedom of Information Act for information about Operation Durango; with this information, he, like Krasilych, hoped to establish that the Attorney General's guidelines had not been followed and to argue, consequently, that the evidence gathered through the investigation should be suppressed. *Id.* He sought a continuance to await the requested information, but the IJ denied the request, reasoning that the Attorney General's guidelines no longer had any force because the former INS was now part of the Department of Homeland Security and was no longer under the Attorney General's control. *Id.* at 794. We concluded, however, that the guidelines were still relevant to undercover investigations and therefore remanded the case in light of the IJ's flawed reasoning. *Id.* But we expressed no opinion about whether the guidelines were legally enforceable or, if so, whether failure to follow them would require exclusion of evidence. These questions, we recognized, were for the BIA to address in the first instance.

Nor would we have taken the position Krasilych suggests. The Attorney General's guidelines are internal rules that have no legal force. Unlike regulations, which

are adopted after notice and comment, internal rules do not bind an agency: "if all the Attorney General has done is to tell his staff how he wants to exercise his discretion—language that brings his subordinates' acts in line with his wishes but does not reduce his discretion to do otherwise—then there is no substantive rule enforceable in any forum." *Miller v. Henman*, 804 F.2d 421, 424 (7th Cir. 1986); *cf. Fano v. O'Neill*, 806 F.2d 1262, 1264 (5th Cir. 1987) (explaining that INS Operations Instructions are nonbinding because they "do not purport to be anything other than internal house-keeping measures"); *Kwon v. INS*, 646 F.2d 909, 918-19 (5th Cir. 1981) (concluding that internal INS procedures "furnish only general guidance for service employees" and do not have the force of law).

But even assuming that the guidelines are enforceable and were not followed in Operation Durango, the BIA was still correct in approving the IJ's decision to deny Krasilych's request to exclude evidence because the exclusionary rule generally does not apply in removal proceedings. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050-51 (1984); *Mireles v. Gonzales*, 433 F.3d 965, 967 (7th Cir. 2006); *Martinez-Camargo v. INS*, 282 F.3d 487, 492 (7th Cir. 2002). In *Lopez-Mendoza*, the Court left open the possibility that the exclusionary rule may apply where there have been "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." 468 U.S. at 1050-51; *see also Martinez-Camargo*, 282 F.3d at 492. Hoping to fit

into this exception, Krasilych blithely asserts that "Fourth Amendment violations" in Operation Durango were "widespread and egregious." What the Fourth Amendment, which prohibits unreasonable searches and seizures, has to do with Krasilych's involvement in Operation Durango escapes us, and he has not even come close to identifying an "egregious violation" of any other liberty.

We turn finally to Krasilych's argument that the temporary I-551 stamp on his passport conferred lawful permanent resident status. The stamp used by Robinson to mark Krasilych's passport was "authentic" in the sense that the same stamp would have been used if the government had approved a bona fide application for permanent residence. When used legitimately, the stamp is a symbol that immigration authorities have favorably adjudicated an application to adjust status, and in the absence of "countervailing evidence" the stamp itself can be used to verify a claim of permanent residence. *See* 8 C.F.R. § 103.2(b)(17); *Sharkey*, 541 F.3d at 80 n.5. But Krasilych's application was never adjudicated (it would have been denied if it was), and the "countervailing evidence" makes clear that the stamp—which expired of its own accord in 2001—was placed in his passport only to give Operation Durango's fraudulent-document scheme the appearance of legitimacy. The stamp, then, is symbolic of nothing.

Because the agency's determination of removability is supported by substantial evidence, and Krasilych did not apply for relief from removal, the order of

removal must stand. Accordingly, the petition for review is DENIED.