In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3017

JAROSLAW MOZDZEN, EWA MOZDZEN, and
SYLWIA MOZDZEN,

*Petitioner*s,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of Orders of the
Board of Immigration Appeals.
Nos. A076-291-213, A076-291-214, A076-291-215

ARGUED APRIL 22, 2010—DECIDED SEPTEMBER 7, 2010

Before KANNE, WILLIAMS, and HAMILTON, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In 1995, Jaroslaw Mozdzen, his wife, and their daughter came to the United States from Poland and unlawfully remained in the country. In an attempt to become permanent residents, they paid $12,000 in cash to a man in the back of a storefront who provided them with "I-551 passport stamps,"

which portrayed them as temporary lawful permanent residents. But in 2005, the Department of Homeland Security did not honor the stamps and initiated removal proceedings against the Mozdzens. An immigration judge ("IJ") found the Mozdzens, natives and citizens of Poland, removable, and the Board of Immigration Appeals ("BIA") agreed. The Mozdzens petition this court for relief but because the Mozdzens have failed to establish lawful presence, we find substantial evidence supports the immigration judge's finding that they are removable. Therefore, we deny the petition for review.

## I. BACKGROUND

On April 1, 1995, Jaroslaw Mozdzen entered the United States as a non-immigrant visitor for pleasure, leaving his wife and infant daughter behind in Poland. As a tourist, Jaroslaw had permission to stay in the United States for a period not to exceed six months. In August 1995, his wife Ewa came to America to join him. She entered the United States through the Canadian border, where she had entered on a visitor's visa. Both Jaroslaw and Ewa continued to unlawfully remain in the United States.

In April 1999, the Mozdzens enlisted the help of Jack Polszakiewicz to receive legal status. According to the Mozdzens, they believed Polszakiewicz was a Polish-speaking travel agent who legally helped people through the immigration process. Polszakiewicz brought the Mozdzens to a travel agency where the Mozdzens gave $12,000 to a man who claimed to be an immigration

official. This man was not wearing a uniform and he was operating out of the back of this travel agency storefront. In exchange, the Mozdzens received a stamp known as an I-551 stamp, and believed they would be favorably adjudicated for legal permanent resident ("LPR") status.

Ordinarily, the I-551 stamp acts as temporary proof of LPR status. In truth, however, Polszakiewicz was a person the government referred to as a "broker," or an individual who found people attempting to obtain immigration documents and brought them to corrupt immigration officials. In exchange for money, the corrupt immigration official would confer LPR status onto people and tell them to explain that they received LPR status through the sponsorship of a citizen sibling. The government set up an undercover operation, Operation Durango, to target these brokers. The broker would bring clients to immigration officials they believed were corrupt, but who were actually working undercover. The undercover immigration official would provide the client with a temporary I-551 stamp in the passport, but the LPR application would not be adjudicated. On April 22, 1999, the Mozdzens received temporary I-551 stamps in their two passports as well as in the passport of Sylwia who lived in Poland.

In August 1999, Ewa traveled to Poland to pick up Sylwia. Jaroslaw also visited Poland around the same time. The Mozdzens returned to the United States on September 12, 1999, and were admitted at Chicago O'Hare International Airport using the temporary I-551

stamp. The Mozdzens had no valid tourist visa at this time. Aside from this visit, the Mozdzens resided continuously in the United States since their arrival in 1995. A second daughter was born in the United States in 1998 and is a United States citizen.

On June 15, 2005, the Department of Homeland Security ("DHS") personally served Jaroslaw and Ewa Mozdzen with a notice to appear. Sylwia received a notice to appear in the mail on December 2, 2005. These notices charged Jaroslaw and Ewa with removability for being present in the United States in violation of 8 U.S.C. § 1227(a)(1)(B), and Sylwia with removability for entering the United States without valid entry documents, 8 U.S.C. § 1227(a)(1)(A). While each case was initially pending in front of different judges, the cases were consolidated per the request of each petitioner. On November 15, 2007, DHS added charges that Jaroslaw and Ewa were removable by engaging in fraud when they reentered the United States using their I-551 stamps.

The Mozdzens, through counsel, both conceded they were natives and citizens of Poland who stayed longer than permitted. On April 25, 2008, a final merits hearing was held. The IJ denied a request for a continuance, and found that based on the concessions alone, the Mozdzens were removable under 8 U.S.C. § 1227(a)(1)(A) because they were inadmissible at the time they entered the county in 1999. In doing so, the IJ did not make any findings as to whether the Mozdzens affirmatively engaged in fraud when obtaining the I-551 stamps. Finally, the IJ found that Ewa did not qualify for cancellation of removal.

## II.  ANALYSIS

### A.  Petitioners Failed to Establish Lawful Presence

The Mozdzens argue that the government was required to rescind their LPR status before it could initiate any removal proceedings against them and that any recission is now barred by a five-year limitations period. A removal proceeding is a civil action to determine eligibility to remain in the United States. *See I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1038-39 (1984). In a removal proceeding, DHS must only establish a petitioner's identity and alienage to shift the burden to the petitioner to prove he is "lawfully present in the United States pursuant to a prior admission" and not removable. 8 U.S.C. § 1229a(c)(2)(B); *Lopez-Mendoza*, 468 U.S. at 1039. We review the IJ's removability decision as supplemented by any additional reasoning by the Board of Immigration Appeals. *Milanouic v. Holder*, 591 F.3d 566, 570 (7th Cir. 2010). The Board's legal conclusions are reviewed de novo, and factual determination are upheld as long as they are supported by substantial evidence. *Krasilych v. Holder*, 583 F.3d 962, 966 (7th Cir. 2009).

Jaroslaw and Ewa conceded that they are natives and citizens of Poland who initially entered the United States as non-immigrants or visitors and stayed longer than permitted. But they claim they are not removable because they are present in the United States as legal permanent residents and lawfully re-entered the country in 1999 based on that LPR status. In April 1999, the Mozdzens, with the help of "travel agent" Polszakiewicz, paid $12,000 to an immigration official they met in the

back of a travel agency. In preparation for this meeting, the Mozdzens were fingerprinted and received medical checkups, as would any applicant for adjustment of status. In exchange, they received I-551 stamps in both their passports and in Sylwia's (who was still living in Poland at this time). A legitimate I-551 stamp acts as a symbol that an application to adjust status has been favorably adjudicated. *See* 8 C.F.R. § 103.2(b)(17). Because the actual permanent resident card may take months to reach the applicant, the temporary I-551 stamp can be used to verify a claim of LPR status in the absence of "countervailing evidence*." Krasilych*, 583 F.3d at 967. The stamp even allows the holder to travel, which Ewa did in August 1999 to retrieve her daughter from Poland. Jaroslaw also traveled abroad in September 1999.

Here, however, the stamp was only provided to give Operation Durango the appearance of legitimacy. In *Krasilych*, the petitioner received an I-551 stamp in connection with Operation Durango, and we rejected his claim that he had any legal status. *Id.* at 966. As it did there, the evidence here shows that this stamp was symbolic of nothing. The Mozdzens' application for LPR status was never adjudicated or processed, and would not have been granted if it had. Perhaps the Mozdzens attempted this path towards LPR status (paying $12,000 to a broker and "corrupt" immigration official) because they lacked a legitimate basis for adjustment—the record reflects that Jaroslaw overstayed his visitor's visa and Ewa entered through Canada. The stamp did nothing to change that unlawful presence, and most certainly did not adjust their status to that of permanent residents.

The Mozdzens argue that they were lawfully admitted in 1999, but the definition of admission for an alien and someone with LPR status differ. For an alien, admission is "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C § 1101(a)(13)(A). And lawful entry, in turn, requires a valid unexpired immigrant visa. 8 U.S.C. § 1181(a). When the Mozdzens reentered the country in 1999, they did not have valid immigrant visas. So, they were never lawfully admitted in 1999, and based on their concessions that they entered the United States using the I-551 stamps in 1999, the IJ correctly found they were removable.

For this reason, we find it unnecessary to discuss the merits of any argument based on LPR status, as the Mozdzens are not entitled to any benefits or processes extended to citizens or legal permanent residents or even people who have improperly become permanent residents. More specifically, 8 U.S.C. § 1256, which provides a process of rescission for persons who have received an adjustment of status, has no applicability, and would not help the Mozdzens even if the I-551 stamp had actually adjusted their status. *Cf. Estrada-Ramos v. Holder*, No. 09-3611, at 5 (7th Cir. July 1, 2010) ("'[L]awfully admitted for permanent residence' does not apply to aliens who 'obtained their permanent resident status by fraud, or *had otherwise not been entitled to it.*'") (citing *Matter of Koloamatangi*, 23 I. & N. Dec. 548, 550 (BIA 2003)) (emphasis in original).

Substantial evidence supports the immigration judge's finding that the Mozdzens were removable, as they

were natives and citizens of Poland who were not lawfully present in the United States. *See* 8 U.S.C. § 1227(a)(1)(A). We deny the petition for review.

### B. No Abuse of Discretion in Denial of Continuance

We review discretionary decisions such as denials of continuances under the deferential abuse of discretion standard. *See Kucana v. Holder*, 130 S. Ct. 827, 831 (2010) (a jurisdictional bar only applies to agency decisions that are made discretionary by statute, and not regulation); *Juarez v. Holder*, 599 F.3d 560, 564-65 (7th Cir. 2010).

A continuance requires a showing of good cause. 8 C.F.R. § 1003.29; *Juarez*, 599 F.3d at 565. The Mozdzens argue that the substitution of an attorney close to the merits hearing date should act as good cause for a continuance. Specifically, counsel argues that his late substitution meant that he was ill-prepared for the merits hearing because he lacked videotapes of Operation Durango in action as well as time to further research avenues for relief. The IJ was well within its discretion to deny the motion for a continuance. The case had been continued several times and the judge had given Jaroslaw over a year to prepare evidence for his cancellation of removal application. Furthermore, the IJ did not rely on Operation Durango or any allegations of wrongdoing by the Mozdzens in making his removal decision. The key facts that provided the basis for removability are not in dispute: the Mozdzens were nationals and citizens of Poland with no legal status in the United States. A continuance to uncover information about the

undercover operation would have had no bearing on that decision and could not change those facts.

### C.  Ewa Ineligible for Cancellation of Removal

The BIA properly affirmed the IJ's finding that Ewa did not qualify for consideration of cancellation of removal. For nonpermanent residents, the Attorney General may:

> cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence, an alien who is inadmissible or deportable from the United States if the alien—
>
> (A) has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application . . . ."

8 U.S.C. § 1229b(b)(1), along with other requirements. The statute then goes on to state that a period of "continuous physical presence" ends "when the alien is served a notice to appear." 8 U.S.C. § 1229b(d)(1). This is referred to as the "stop-time rule." *Dababneh v. Gonzales*, 471 F.3d 806, 810 (7th Cir. 2006). Ewa arrived in the United States via Canada sometime in August 1995, and she was personally served with a notice to appear on June 16, 2005. The argument that the stop-time rule does not apply here is contrary to the plain language of the statute and precedent, 8 U.S.C. § 1229(d)(1); *see also, e.g., Dababneh*, 471 F.3d at 810, and we reject it. Ewa only acquired nine years and nine months of physical presence prior to

receiving her notice to appear, and she is statutorily ineligible for cancellation.

## III.  CONCLUSION

For the reasons stated above, the petitions for review are DENIED.