# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-1618

ALICJA KANIA WROBLEWSKA,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review from an Order of the
Board of Immigration Appeals.
No. A 077 646 892

SUBMITTED FEBRUARY 7, 2011*—DECIDED AUGUST 24, 2011

Before ROVNER and WOOD, *Circuit Judges*, and
GOTTSCHALL, *District Judge.***

WOOD, *Circuit Judge*. Alicja Kania Wroblewska, the
petitioner, is a citizen of Poland who came to the

* After an examination of the briefs and the record, we have
concluded that oral argument is unnecessary. Thus the appeal is
submitted on the briefs and the record. FED. R. APP. P. 34(a)(2).

** The Honorable Joan B. Gottschall, of the Northern District
of Illinois, sitting by designation.

United States on a visitor's visa in 1994. She overstayed her visa and was caught allegedly trying to bribe an immigration officer in November 1999 in Operation Durango, a sting operation with which we have become quite familiar. See *Pawlowska v. Holder*, 623 F.3d 1138 (7th Cir. 2010); *Mozdzen v. Holder*, 622 F.3d 680 (7th Cir. 2010); *Krasilych v. Holder*, 583 F.3d 962 (7th Cir. 2009); *Skorusa v. Gonzales*, 482 F.3d 939 (7th Cir. 2007); *Pieniazek v. Gonzales*, 449 F.3d 792 (7th Cir. 2006).

Before her removal proceedings began, Wroblewska married Boguslaw Kania, a U.S. citizen. Kania filed a petition for an alien relative visa; in it, he named Wroblewska as the beneficiary. In October 2006, shortly after the petition was approved, Wroblewska filed an application to adjust her status under section 245 of the Immigration and Nationality Act, 8 U.S.C. § 1255. She then appeared in the Immigration Court for the first time and admitted that she was removable as a non-immigrant visitor present in the country beyond the time allowed by her visa. See 8 U.S.C. § 1227(a)(1)(B). At the same time, she moved to suppress all of the adverse evidence that had been collected in 1999 through Operation Durango, and she asked the Immigration Judge (IJ) to terminate the removal proceedings because of her application for an adjustment of status. The IJ found Wroblewska removable, denied her motion to suppress, and decided that she was not entitled to adjust her status. In the IJ's opinion, adjustment was not warranted because the evidence from Operation Durango showed that Wroblewska had bribed an immigration official, and that behavior outweighed all of the equities in favor

of relief. The Board of Immigration Appeals dismissed Wroblewska's appeal, and this petition followed.

Wroblewska faces an uphill battle because of limitations to the court's jurisdiction in this area. Although we might have been inclined to weigh the equities more charitably than the IJ did, Congress has not granted us that authority. Any challenge to the IJ's denial of Wroblewska's application for an adjustment of status had to be based on legal or constitutional arguments. In that regard, Wroblewska's lawyer—Reza Baniassadi—seriously hampered her chances. In Wroblewska's petition, Attorney Baniassadi presented a single, underdeveloped legal argument: that evidence gathered during Operation Durango should have been suppressed because the operation itself was an egregious violation of Wroblewska's right to due process. Worse yet, this argument was foreclosed by *Krasilych v. Holder*, *supra*, a decision that was issued more than a year before Wroblewska's opening brief was filed in this case. Accordingly, we deny Wroblewska's petition for review. We will have more to say about Attorney Baniassadi's performance shortly.

# I

Given the extensive treatment of Operation Durango in our previous decisions, we can be brief with the details. It was a sting designed by three federal agencies to catch "brokers" who were helping to procure immigration benefits for aliens illegally. The brokers would take aliens who hoped to become permanent residents of the

United States to a storefront on the north side of Chi-
cago. There they would meet with undercover immigra-
tion agents who held themselves out as corrupt officials
ready to help with the adjustment of status. The brokers
sometimes told the aliens that the process was real and
legal. See, *e.g.*, *Skorusa*, 482 F.3d at 940. Still, the agencies
that ran the operation maintain that they took steps to
make sure that neither aliens nor brokers caught in
their net would later assert that they had been confused
about the legality of the transactions taking place. The
government points out that there were no signs on
display in the store that would have given the impres-
sion that it was a government office, nor did the under-
cover immigration officials who worked the sting wear
INS uniforms.

Apart from decor and dress code, however, the proce-
dure used in Operation Durango looked a lot like the
normal adjustment-of-status process. In most cases,
including the one now before us, Clarence Robinson
was the immigration officer working undercover. Robin-
son would meet the alien; he would help her to fill out
an I-485 application for adjustment of status; and he
would interview her as he would any other person who
might have applied for a change in status through
regular channels. At the conclusion of the meeting, Robin-
son would place a genuine I-551 stamp in the alien's
passport. This stamp usually signifies that a person's
application for adjustment of status has been approved
and that she is awaiting a green card. But see *Mozdzen*,
622 F.3d at 684 (holding that stamps obtained through
Operation Durango do not change an alien's legal status).

To increase the appearance of authenticity, meetings with Robinson were preceded by fingerprinting and medical checkups—two steps required of all people who apply for adjustment of status.

When the meetings ended, the alien would pay Robinson a $5,000 fee, usually through the broker facilitating the transaction. Robinson would explain to the alien that she should tell any official who inquired that she had been granted adjustment of status because of a petition filed by a U.S. citizen sibling. In Wroblewska's case, Robinson instructed her to tell anyone who inquired that she had met with him at the INS offices in downtown Chicago. During Operation Durango, Robinson met with almost 300 aliens and their brokers. The local U.S. Attorney's Office prosecuted the brokers, and the aliens—most of them from Eastern Europe—were referred for removal proceedings.

Throughout her removal proceedings, Wroblewska has maintained that she thought she was adjusting her status legally in 1999, and she has always denied paying a $5,000 bribe to Robinson. Her story is believable in some respects. In the past, we have called Operation Durango "a shady sting operation that in some countries . . . might represent the way that business is actually done," *Pawlowska*, 623 F.3d at 1142, and we have also noted that, throughout the operation, "Robinson tried to make the process seem[] as official as possible," *Skorusa*, 482 F.3d at 941. Moreover, the evidence presented during the removal proceedings relating to the bribe that Wroblewska allegedly paid to Robinson

was remarkably thin. Wroblewska testified that she did not pay a bribe; and Robinson testified that Wroblewska's broker paid him $5,000 after their meeting had ended. Robinson admitted, however, that he had no direct evidence that Wroblewska furnished that money—he did not see Wroblewska give the broker $5,000 and the broker made the payment after Wroblewska left. According to the government, a video recording of the entire transaction was made, but we have no idea if that is so, because the government did not introduce it as evidence and the IJ never asked to see it.

The IJ noted that Wroblewska satisfied two of the three statutory factors required for adjustment of status: she had been lawfully admitted into the United States when she arrived, and a visa was immediately available given her husband's successful petition; the only open question was whether Wroblewska's moral character warranted a favorable exercise of discretion. The IJ identified "strong equities" that weighed in favor of approving Wroblewska's application for an adjustment of status. Wroblewska had been married happily to a U.S. citizen for a number of years; she and her husband had mingled their assets and had lived together without interruption; she had no criminal record; and she was gainfully employed. Nonetheless, the IJ ultimately concluded that the balance of equities weighed against her, solely because he found that her assertion that she never bribed Robinson was not credible. "I do not find the respondent's testimony that she did not know that she was bribing an officer to be credible," the IJ said,

before continuing cryptically, "The circumstances speak to her intent, which [*sic*] she actually did on November 1999, speaks to what she intended to do. And that those circumstances point clearly to an effort of bribery rather than to an innocent who is simply mislead [*sic*] by a broker." By that the IJ presumably meant that Wroblewska must have known that $5,000 was too high a price to pay to adjust her status legally, she should have been suspicious of Robinson's instruction to lie about the location of the interview, and she must have known that she was not eligible to adjust her status in 1999. The Board agreed with the IJ's assessment.

The agency's evaluation of the equities is not particularly persuasive. Were we in the IJ's shoes, faced with the government's assertion that an alien had bribed a federal immigration official, we would demand more than weak circumstantial evidence to support that allegation. It is especially troubling that the government purported to have a video recording of the entire transaction, but then it never produced any such thing. With a swearing match on the stand and an objective record of the transaction available, it is baffling why the agency would not have been interested in seeing what actually had occurred at the meeting between Wroblewska and Robinson. In light of the government's weak evidence of bribery and Wroblewska's happy marriage and fruitful participation in the community, we might have weighed the equities differently than the agency. But that is not our role. We lack jurisdiction to review a variety of agency decisions denying discretionary relief, including an IJ's decision to deny an application for

adjustment of status. See 8 U.S.C. § 1252(a)(2)(B)(i) (barring review of decisions made pursuant to 8 U.S.C. § 1255, among other provisions); *Pawlowska*, 623 F.3d at 1141 & n.4 (explaining that the Court's decision in *Kucana v. Holder*, 130 S. Ct. 827 (2010), does not affect this jurisdictional bar). The IJ's view of Wroblewska's credibility and his balancing of the equities must therefore stand undisturbed.

## II

Our jurisdiction is not so limited, however, when it comes to "constitutional claims or questions of law" that are related to the denial of an application for adjustment of status. 8 U.S.C. § 1252(a)(2)(D); *Jarad v. Gonzales*, 461 F.3d 867, 868-69 (7th Cir. 2006). Wroblewska's petition presents a single legal argument. She says that all evidence gathered in Operation Durango should have been excluded from her removal proceedings because the operation violated her right to due process. Without this evidence, she implies, the IJ would have had no reason to deny her application for an adjustment of status.

If there is a good due process challenge to Operation Durango out there, we would not know from the arguments made here. Indeed, the entire argument section of Wroblewska's opening brief in this court included only about 500 words. The substance of her claim—apart from a conclusory suggestion that the Supreme Court's decision in *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1040-50 (1984) is distinguishable—is presented in a single paragraph:

> The IJ and the BIA erroneously held that the Petitioner did not demonstrate that the evidence was obtained as a result of an egregious violation of due process rights. In the present case, the Service's actions were not limited to a simple arrest. The Service's actions, however, amounted to malicious entrapment of law abiding citizens. To be precise, the Service's Operation Durango targeted Polish and Eastern European community [*sic*] in Chicago, during which the Service sought out law abiding citizens and through its undercover agents, encouraged and trapped people to submit baseless applications for adjustment of status.

Petitioner's Br. at 13-14. Attorney Baniassadi did not attempt to elaborate on this statement or to respond to any of the government's counterarguments, because he chose not to file a reply brief.

In addition to the fact that counsel's argument on behalf of Wroblewska is so cursory, it is also unsatis-factory because, without explanation, it relies on an argument that had been squarely foreclosed in another decision about Operation Durango that we issued one year before Wroblewska's opening brief was filed. We said in *Krasilych* that a petitioner who "blithely asserts that 'Fourth Amendment violations' in Operation Durango were 'widespread and egregious'" does not demonstrate a violation of the Fourth Amendment or of any other liberty. 583 F.3d at 967. Attorney Baniassadi attempts to explain away *Krasilych* in a footnote, remarking that he filed Wroblewska's notice of appeal

*in the agency* before we issued our decision in *Krasilych*. This is a *non sequitur*, not a ground on which our prior decision can be distinguished. Attorney Baniassadi knew of *Krasilych* when he filed his brief and he should have confronted it. Instead, he repeated the precise mistake that we criticized in *Krasilych*: he blithely asserts that Operation Durango was "an egregious violation of due process rights," but he does not explain why. It would be different if he had acknowledged our earlier decision and indicated that he was preserving a point for further review, but there is no such indication in the brief. The Supreme Court has required a showing of "egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness" before the exclusionary rule will apply in immigration proceedings. *Lopez-Mendoza*, 468 U.S. at 1050-51. It makes no difference that Wroblewska's argument is styled as a due-process argument rather than one based on the Fourth Amendment. Finally, to the extent that the brief suggests that Wroblewska was entrapped, counsel misunderstands entrapment. "Entrapment refers to the use of inducements that cause a normally law-abiding person to commit a crime." *United States v. Morris*, 549 F.3d 548, 551 (7th Cir. 2008). At the time that Wroblewska was caught in the sting she was committing a continuing violation of the immigration laws and had no basis for applying for an adjustment of status. Operation Durango simply brought her to the attention of immigration officials.

For these reasons we must deny Wroblewska's petition for review. We are disturbed, however, by Attor-

ney Baniassadi's perfunctory performance. People in Wroblewska's position face life-changing consequences from their immigration proceedings. *Cf. Padilla v. Kentucky*, 130 S. Ct. 1473 (2010). Because Attorney Baniassadi's effort fell far below the minimum standards for competent representation in this court, we are requesting the Clerk of the Court to forward a copy of this opinion to the Illinois Attorney Registration & Disciplinary Commission.

* * *

The petition for review is DENIED.