NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 13, 2012
Decided January 31, 2013

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 11-3907

| | |
|---|---|
| PLAMEN SLAVOV and NELI STEFANOVA, *Petitioners,* | Petition for Review of an Order of the Board of Immigration Appeals. |
| *v.* | Nos. A077-776-294 & A077-776-295 |
| ERIC H. HOLDER, JR., Attorney General of the United States, *Respondent.* | |

## O R D E R

Plamen Slavov and Neli Stefanova petition for review of a decision of the Board of Immigration Appeals upholding an immigration judge's order of removal. Slavov and Stefanova argue that the IJ denied them their statutory and due-process rights to a fair hearing. Because the IJ did not violate any statutory or constitutional norm that prejudiced the petitioners, we deny the petition.

## I. Background

Slavov and Stefanova are Bulgarian citizens who separately entered the United States on nonimmigrant tourist visas in July 1996. They both overstayed their visas and married in 1997. Shortly after they married, Slavov's employer petitioned for employment certification for Slavov; the Department of Labor approved it in March 2001. Based on the approved certification, Slavov's employer filed an I-140 visa petition on Slavov's behalf, which was approved in November 2002.

Three years earlier, while Slavov's labor certification petition was pending and the couple remained in unlawful status, friends referred them to a man named Jack Polszakiewicz. Polszakiewicz asserted that for a $5,000 fee, he could expedite the process to achieve lawful status, but his scheme was foiled by Operation Durango. This Operation was a collaboration among the Immigration and Naturalization Service, Federal Bureau of Investigation, and Social Security Administration to investigate the unlawful procurement of immigration benefits. To ensnare "brokers" like Polszakiewicz seeking to bribe immigration officials, Operation Durango used an undercover agent to pose as a corrupt government official who took bribes in exchange for issuing permanent-residency documents. The undercover agent conducted interviews that resembled a typical immigration interview. At the end of the interviews, the agent would imprint the alien's passport with a stamp purportedly denoting status as a lawful permanent resident and then give the alien a fictitious cover story to tell to other immigration officials.

In this case, Polszakiewicz arranged for Slavov and Stefanova to interview with INS Agent Clarence Robinson in 1999, and he attended the interview as well. The parties agree that a videotape of the interview shows that the couple received their permanent-residence stamp, their cover story, and paid money for the service. The cover story was that Stefanova's U.S.-citizen brother sponsored her permanent residency; Slavov's story was that his status was derivative of Stefanova's. Robinson instructed them to tell that story to any inquiring immigration officer. Stefanova does have a brother, but the couple knew that at the time of this interview, he lived in Bulgaria, had never been to the United States, and was not a U.S. citizen. After listening to the cover story, Stefanova asked how it would affect her brother if he ever wanted to become a U.S. citizen, and Polszakiewicz told her not to worry about it. At the end of the meeting, Robinson counted the money that Slavov and Stefanova had brought.

Four years later, in 2003, Immigration and Customs Enforcement ("ICE") placed Slavov and Stefanova in removal proceedings under § 237(a)(1)(B) of the Immigration and Naturalization Act ("INA") for overstaying their visas. They conceded removability for overstaying their visas, but requested adjustment of status based on the approved,

employer-sponsored visa petition. They also requested a subpoena for the videotape of the interview with Robinson and moved to suppress any evidence related to Operation Durango, arguing that the Operation entrapped them and that they had no intent to defraud authorities. ICE opposed producing the tape, asserting that it did not plan to rely on the tape in seeking removal, it did not possess the tape anyway (the FBI did), and the cost of transcribing the tape was prohibitive. The couple argued that the government has produced similar tapes before, and they could use the tape to prepare their case, impeach the government's witnesses, and present "the best evidence of what went on."

Before the hearing the IJ declined to subpoena the videotape. He adopted the government's argument that the couple failed to satisfy the regulation requiring a party to "state in writing or at the proceeding, what he or she expects to prove by such . . . documentary evidence, and to show affirmatively that he or she has made diligent effort, without success, to produce the same." 8 C.F.R. § 1003.35(b)(2). Petitioners moved for interlocutory appeal of the IJ's decision, which the Board denied.

As the hearing neared, the government shifted course and decided to present the videotape after all. The parties, their attorneys, and the judge all viewed it together—off the record—at the hearing on March 25, 2009. Immediately after this viewing, the government recapped for the record what transpired on the videotape, with the IJ and petitioners' attorney making corrections for the agreed-upon summary that we recounted earlier. The hearing was continued, and the tape was played a second time, still off the record but again viewed by the parties, counsel, and the IJ, at the next hearing nearly six months later, before Robinson and another officer involved with Operation Durango testified.

Slavov and Stefanova did not have access to the videotape before their first day of testimony, but both were able to testify further after viewing the videotape. When Slavov testified after seeing the tape, he admitted that during the interview, he knew that their cover story was false and realized that the process was illegal when he saw Robinson counting the money. Stefanova testified that during the interview, she did not understand Robinson, denied believing that anything illegal was occurring, but did not dispute that the tape accurately reflected that she asked how the cover story would affect her brother, who she knew—contrary to the cover story—was not really a U.S. citizen and had never been to the U.S.

The IJ denied the petitioners' requests for relief and ordered them removed to Bulgaria. First, the IJ denied the couple's motion to suppress the evidence of Operation Durango. He reasoned that the investigation was not "egregious," which is the relevant standard under the plurality opinion in *INS v. Lopez-Mendoza,* 468 U.S. 1032 (1984), for invoking the exclusionary rule in a civil removal proceeding. Next, relying on the evidence

about Operation Durango, the IJ denied adjustment of status, reasoning that Slavov and Stefanova must have known they were ineligible to receive the immigration benefit that Robinson bestowed. Thus, the IJ concluded, Slavov and Stefanova did not have the requisite good moral character for discretionary adjustment of status.

Slavov and Stefanova appealed to the Board of Immigration Appeals, arguing that by denying them prior access to the videotape and then relying on it without entering it in the record, the removal proceedings did not comply with INA § 240(b)(4), *see* 8 U.S.C. § 1229a(b)(4), and due process. They also renewed their arguments that Operation Durango was egregious and entrapped them, so evidence from it should have been suppressed. Finally, they argued, they did not know they were unlawfully seeking an immigration benefit from Robinson, so it was an abuse of discretion for the IJ to deny their applications for adjustment of status for lack of good moral character.

The Board dismissed the appeal. It agreed with the IJ that Operation Durango was not "egregious" and that their entrapment argument failed because when they met with Robinson, they were out of lawful status and therefore were not law-abiding persons induced into committing a crime. The Board also concluded that the couple received a fair hearing under the INA because they had access to the interview tape at the hearings, they could testify to their perception of the events reflected on the tape, and agreed to a summary of its contents, which was entered into the record for the IJ to rely upon. The Board continued that because they conceded removability and sought only discretionary relief, their due-process rights were not violated. Finally, the Board concluded that the IJ reasonably found that they lacked good moral character based on their unlawful conduct seeking immigration benefits.

## II. Discussion

We have jurisdiction to hear constitutional claims and questions of law. 8 U.S.C. § 1252(a)(2)(D); *Alvarado-Fonseca v. Holder,* 631 F.3d 385, 389 (7th Cir. 2011). Here, petitioners raise a constitutional claim based on due process and a legal question challenging whether the immigration proceeding complied with § 1229a(b)(4). We review these questions de novo. *Alvarado-Fonseca*, 631 F.3d at 389.

Slavov and Stefanova first argue that Operation Durango was sufficiently egregious that the exclusionary rule requires suppression of all evidence obtained from it. The exclusionary rule is a judicially crafted remedy designed to deter unlawful police conduct, *see Davis v. United States,* 131 S. Ct. 2419, 2427 (2011); *Lakeland Enters. of Rhinelander, Inc. v.*

*Chao,* 402 F.3d 739, 744 (7th Cir. 2005), and is generally unavailable in civil removal hearings, *see Gutierrez-Berdin v. Holder,* 618 F.3d 647, 652 (7th Cir. 2010) (citing *Lopez-Mendoza,* 468 U.S. at 1050–51). We have held that a generalized claim that the government's conduct during Operation Durango violated the Constitution does not warrant suppression. *See Wroblewska v. Holder,* 656 F.3d 473, 477–78 (7th Cir. 2011). But we left open the possibility that relief could be warranted if an alien could persuasively demonstrate that violations were both " 'widespread and egregious.' " *Id.* (quoting *Krasilych v. Holder,* 583 F.3d 962, 967 (7th Cir. 2009)).

Slavov and Stefanova contend that Robinson's conduct in Operation Durango was egregious because he took advantage of two aliens with poor English skills who were unaware that the process for expediting adjustment of status was unlawful. But when he interviewed with Robinson, Slavov had already started the process to adjust his status by applying for labor certification to become eligible for a permanent employment-based visa, so he was aware of the lawful process. And Stefanova testified that before her interview, she had worked as a travel agent, fielding phone calls and operating an English-language computer program. In any case, even if the petitioners were unsophisticated and not completely fluent in English, the government's conduct did not offend due process unless it knew of these weaknesses and sought to exploit them, and the record does not reflect this. *See, e.g., United States v. Kindle,* 698 F.3d 401, 413 (7th Cir. 2012) (quoting *United States v. Hollingsworth,* 27 F.3d 1196, 1203 (7th Cir. 1994) (en banc)) (justifying government activity that does not " 'exploit[] the susceptibilities of a weak-minded person' "); *United States v. Miller,* 891 F.2d 1265, 1267–69, 1269 n.4 (7th Cir. 1989) (requiring "outrageous conduct" and "extreme circumstances" to violate due process).

The petitioners next argue that the IJ's refusal to subpoena the government to provide the interview tape before the hearing and his reliance on it without playing it on the record violated their due-process rights to a fair hearing. The due-process argument requires little discussion. Petitioners conceded their removability from the outset, so the hearings were limited to their application for discretionary relief. Because "an alien eligible for discretionary relief does not have a substantive entitlement, . . . there is no liberty interest at stake in a proceeding where an alien seeks discretionary relief." *Delgado v. Holder,* 674 F.3d 759, 765 (7th Cir. 2012).

The petitioners' more substantial argument is statutory: whether the IJ denied them their statutory right to a fair hearing under § 1229a(b)(4). *See id.* at 766 (applying § 1229a(b)(4) to discretionary proceedings). First, they argue that the IJ's reliance on the videotape without putting its contents in the record violated the statutory requirement that a complete record be kept of all the evidence presented at the hearing. *See* 8 U.S.C.

§ 1229a(b)(4)(C). The government contends that petitioners waived this argument by failing to raise it before the Board. But the petitioners' notice of appeal to the Board argues that the immigration judge relied on improper evidence, so they preserved the issue. On the merits the government argues that the IJ complied with § 1229a(b)(4)(C) by entering in the record and relying on the agreed-upon summary of the videotaped interview as an offer of proof in lieu of the videotape itself. Immigration judges may use offers of proof to control the scope of the proceedings. *See, e.g., Delgado,* 674 F.3d at 768; *Apouviepseakoda v. Gonzales,* 475 F.3d 881, 888 (7th Cir. 2007); *Alimi v. Ashcroft,* 391 F.3d 888, 890–91 (7th Cir. 2004). Furthermore, the petitioners did not object to admitting the summary into the record, and the IJ allowed them to supplement that summary with their own testimony about the interview. Under these circumstances the IJ did not improperly admit and rely on the summary of the videotape. *See Apouviepseakoda,* 475 F.3d at 889.

The petitioners' second, and even closer statutory argument, is that the IJ denied them a "reasonable opportunity to examine the evidence against [them]" by refusing to order the government to provide them with a copy of the videotape before their testimony. 8 U.S.C. § 1229a(b)(4)(B). At some point before the hearing, the tape became available to the government, and yet the petitioners were never allowed to review the tape privately with their attorney. Advance study of the tape might have better enabled the couple to refresh their recollection about events around the interview and to prepare for cross-examination. "Receiving key evidence on the day of the hearing seems to fall well short of this [§ 1229a(b)(4)(B)] standard." *Tadesse v. Gonzales,* 492 F.3d 905, 909 (7th Cir. 2007).

But § 1229a(b)(4)(B) requires only a "reasonable opportunity" to examine the evidence. Although advanced production of key evidence is preferable, harm from belated production may be nullified if the alien can return to court later to rebut that evidence. *Id.* at 909. Here, both Slavov and Stefanova had an opportunity to testify *after* viewing the tape on March 25, 2009: Slavov was able to finish his testimony immediately after viewing the tape and hearing the summary in March, and Stefanova had nearly six months after viewing the tape to confer with her attorney before testifying again in September. The two viewings also occurred before they cross-examined the government's witnesses. Moreover, each time the government played the videotape, the petitioners were in the room. They were able to inspect both the tape and the machine that played it. By allowing the petitioners to watch the recording twice, the IJ provided a reasonable opportunity to examine the evidence.

Even if the IJ should have given the petitioners the tape to watch in advance of the hearing, they must show prejudice to overturn the removal order. *See Apouviepseakoda,* 475 F.3d at 885; *Hussain v. Keisler,* 505 F.3d 779, 781 (7th Cir. 2007); *Chakir v. Gonzales,*

466 F.3d 563, 567 (7th Cir. 2006); *Kuschchak v. Ashcroft,* 366 F.3d 597, 605 (7th Cir. 2004). In their reply brief, the petitioners speculate that had they been able to watch the videotape privately with their attorney, at the hearing they might have better explained their conduct, thereby improving their bid to adjust status. They offer no specifics, though, which is necessary to prove prejudice. *See Rehman v. Gonzales,* 441 F.3d 506, 509 (admonishing that not offering specifics is a "fatal shortcoming" on appeal). The couple suggest that they cannot be specific because they still have not reviewed the tape in private. But they have reviewed the hearing transcripts, and they identify nothing in the record that might be false or should be supplemented. Furthermore, no matter how far in advance the petitioners watched the videotape, it would still reveal, as reflected in the agreed-upon summary, that they knew they were preparing to lie to receive immigration benefits. The couple understood that the cover story was false because Stefanova asked how the story would affect her U.S.-citizen brother, who they both knew was not a citizen. Even apart from the tape, Slavov admitted at the hearing that he understood from the exchange of cash during the interview that the process was unlawful, yet they proceeded to accept the unlawful immigration benefit. The petitioners proffer no supplementary testimony that would undercut this evidence of misconduct upon which the IJ refused to adjust status.

For the foregoing reasons, we **DENY** the petition for review.