**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 45755**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Filed: February 7, 2020** |
| Plaintiff-Respondent, | ) |
| | ) **Karel A. Lehrman, Clerk** |
| v. | ) |
| | ) **THIS IS AN UNPUBLISHED** |
| DAVID J. WHITECOTTON, | ) **OPINION AND SHALL NOT** |
| | ) **BE CITED AS AUTHORITY** |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Sixth Judicial District, State of Idaho, Power County. Hon. Robert C. Naftz, District Judge.

Judgment of conviction for unlawful possession of a firearm, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Brian R. Dickson, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Ted S. Tollefson, Deputy Attorney General, Boise, for respondent.

_____

LORELLO, Judge

David J. Whitecotton appeals from his judgment of conviction for unlawful possession of a firearm. Whitecotton argues that the district court erred when it denied his motion to suppress and that the district court abused its discretion at sentencing. We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

One afternoon, a citizen observed a man pacing outside a local pharmacy. After entering the pharmacy to fill a prescription, the citizen watched the man enter and inquire about maps. The citizen then left the pharmacy to meet a family member at the neighboring supermarket. Upon leaving the supermarket, the citizen and her brother struck up a conversation with some friends they encountered in the parking lot. The man then approached the group and injected

1

himself into their conversation and introduced himself as Whitecotton. Whitecotton then lingered with the group and kept turning his body toward them to display his holstered firearm. After a few minutes, the conversation ended and the citizen left. The citizen found Whitecotton's behavior so strange and suspicious that she went to the police department with her brother and reported him.

In response to the citizen's report, an officer was dispatched to the pharmacy. The officer observed a vehicle with Oregon license plates matching the one reportedly associated with Whitecotton. The officer parked his patrol vehicle in a parking spot several feet away and approached Whitecotton's vehicle on foot. The officer made contact with Whitecotton, who was sitting in the driver's seat of the vehicle, and began a conversation with him. The officer told Whitecotton that "somebody called and said [he] was acting really weird." As the officer told Whitecotton about the call, Whitecotton started his vehicle and said something in response, which was inaudible over the vehicle's engine noise. The officer responded: "What was that? Talk to me for a minute. Turn that off." Whitecotton complied. During the ensuing conversation, the officer asked Whitecotton about the kind of gun he had and why he had been in the store. Whitecotton said he was buying a football for a kid. The officer then asked Whitecotton for his driver's license. When Whitecotton responded by asking the officer whether he had "cause for this," the officer explained that he would get out of Whitecotton's "hair in a minute," but the officer wanted to know who he was talking to. Whitecotton could not produce a driver's license, but eventually provided an identification card. When asked where he lived, Whitecotton stated that he lived in Oregon, was staying in a nearby motel, and was "just passing through." During the course of the interaction, the officer reiterated that he made contact with Whitecotton because of the citizen's report. The officer advised that he did not think Whitecotton was doing anything "wrong" and that the officer planned to indicate in his report that he spoke with Whitecotton.

When the officer ran Whitecotton's name through dispatch, he learned that Whitecotton's driving privileges were revoked due to a felony driving under the influence conviction in Oregon. Although the officer detected a slight odor of alcohol on Whitecotton's breath, Whitecotton denied consuming any alcohol that day. Because the check revealed no other pending charges or holds, the officer released Whitecotton after admonishing him not to drive.

Whitecotton thanked the officer, and the officer told Whitecotton to let the officer know if Whitecotton needs anything and to try not to "scare people."

After returning to his patrol vehicle, the officer observed Whitecotton back out of his parking space and begin driving away despite the officer's clear admonition moments before that Whitecotton could not legally drive, and his agreement that he would not. The officer pursued Whitecotton, who pulled into another parking spot just before entering the roadway. Upon reinitiating contact with Whitecotton, the officer informed Whitecotton that he could not legally possess a firearm due to his status as a convicted felon. The officer requested that Whitecotton relinquish his firearm. He refused and fled in his vehicle. Whitecotton then led officers on a slow-speed chase. During the chase, dispatch notified the officer that Whitecotton had cautions for weapons charges against officers and domestic violence. Despite being pursued by more than one law enforcement vehicle with active sirens and emergency lights, Whitecotton did not stop until he reached the motel where he was staying. After pulling into the hotel parking lot, Whitecotton exited his vehicle while no longer wearing the gun holster. Whitecotton initially disregarded repeated commands from armed officers to raise his hands and surrender, but was ultimately arrested without further incident.

After Whitecotton was taken into custody, officers found the fully loaded handgun in the vehicle Whitecotton was driving. A subsequent inventory search of the vehicle led to the discovery of a box of ammunition containing an additional twenty-five rounds for the handgun along with a nearly empty bottle of whiskey.

The State charged Whitecotton with unlawful possession of a firearm. Whitecotton filed a motion to suppress seeking suppression of "any statement, including [his] identity, that was obtained after the illegal seizure."[1] The parties waived hearing on the motion, stipulating to submit the matter on the briefs and on three exhibits--the officer's police report, the written statement by the citizen who reported Whitecotton, and the video of the interactions with Whitecotton taken from the officer's body camera. The district court denied Whitecotton's

---

[1] The United States Supreme Court has held that the identity of a defendant in a criminal case "is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *Immigration & Naturalization Serv. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984).

motion, concluding that he was seized when the officer told Whitecotton to turn off his vehicle, but the seizure was supported by reasonable suspicion.

Pursuant to a plea agreement, Whitecotton pled guilty to unlawful possession of a firearm. In exchange for his plea, the State agreed to dismiss misdemeanor charges in other cases pending against Whitecotton. However, Whitecotton failed to appear for sentencing. He was eventually arrested, and his sentencing hearing was rescheduled. During his rescheduled sentencing hearing, Whitecotton moved to withdraw his guilty plea. The district court granted the motion and set the matter for a jury trial.

A jury found Whitecotton guilty of unlawful possession of a firearm. Whitecotton subsequently moved for reconsideration of his sentence under I.C.R. 35. After holding a hearing, the district court denied the motion. Whitecotton appeals.

## II.

## STANDARD OF REVIEW

The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999). However, when we have "exactly the same evidence before [us] as was considered by the district court," we will freely review and weigh the evidence in the same manner as the trial court.[2] *State v. Andersen*, 164 Idaho 309, 312, 429 P.3d 850, 853 (2018).

An appellate review of a sentence is based on an abuse of discretion standard. *State v. Burdett*, 134 Idaho 271, 276, 1 P.3d 299, 304 (Ct. App. 2000). Where a sentence is not illegal, the appellant has the burden to show that it is unreasonable and, thus, a clear abuse of discretion. *State v. Brown*, 121 Idaho 385, 393, 825 P.2d 482, 490 (1992). A sentence may represent such an abuse of discretion if it is shown to be unreasonable upon the facts of the case. *State v. Nice*,

---

[2] Nevertheless, we note that neither party challenges the district court's factual findings nor do we see any basis for concluding those findings are erroneous.

103 Idaho 89, 90, 645 P.2d 323, 324 (1982). A sentence of confinement is reasonable if it appears at the time of sentencing that confinement is necessary to accomplish the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation, or retribution applicable to a given case. *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982). Where an appellant contends that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record, having regard for the nature of the offense, the character of the offender, and the protection of the public interest. *State v. Reinke*, 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct. App. 1982). When reviewing the length of a sentence, we consider the defendant's entire sentence. *State v. Oliver*, 144 Idaho 722, 726, 170 P.3d 387, 391 (2007).

## III.

## ANALYSIS

### A.    Motion to Suppress

Whitecotton argues that the district court erred in denying his motion to suppress. Specifically, Whitecotton asserts that, by failing to identify what specific criminal offense the officer conducting the investigative detention had reasonable suspicion to investigate, the district court applied the incorrect legal standard to determine whether the investigative detention was lawful and that, according to the correct standard, insufficient reasonable suspicion existed for an investigative detention. The State argues that the district court correctly determined that the investigative detention was lawful because the officer had reasonable suspicion that *some* criminal activity was afoot.[3] We hold that the district court did not err in denying Whitecotton's

---

[3]    In his reply brief, Whitecotton contends that the State's appellate argument must be limited to the State's argument in district court that the officer had reasonable suspicion of a "potential theft, burglary, and/or robbery of the pharmacy or one of the nearby stores" based on "Whitecotton's behavior of pacing around in front of the pharmacy while armed" and/or reasonable suspicion that "Whitecotton could have been about to engage in some form of exhibiting a deadly weapon and/or committing an assault with said weapon" based on "Whitecotton's interjection into the conversation between the [reporting citizen] and her friends." Because this preservation argument is subsumed by our analysis of Whitecotton's claim regarding the proper legal standard for reasonable suspicion, it does not require a separate analysis.

5

motion to suppress because the encounter between the officer and Whitecotton complied with the Fourth Amendment.

We reject Whitecotton's assertion that the district court erred by failing to identify a specific criminal offense related to Whitecotton's conduct. This Court has previously rejected the argument that reasonable suspicion requires specific criminal activity. In *State v. Perez-Jungo*, 156 Idaho 609, 615, 329 P.3d 391, 397 (Ct. App. 2014), we held that reasonable suspicion does not require a belief that any *specific* criminal activity is afoot to justify an investigative detention. Rather, all that is required is a showing of objective and specific articulable facts giving reason to believe that the individual has been or is about to be involved in *some* criminal activity. *Id.* This holding is consistent with the United States Supreme Court's description of reasonable suspicion as it relates to criminal activity. *See, e.g.*, *United States v. Arvizu*, 534 U.S. 266, 272 (2002) (noting that the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion that criminal activity may be afoot); *Brown v. Texas*, 443 U.S. 47, 52 (1979) (noting that an officer must have reasonable suspicion, based on objective facts, that the individual is involved in criminal activity).

Whitecotton concedes that *Perez-Jungo* made "clear that officers need not have reasonable suspicion of a specific crime," but contends there must still be an "overarching categor[y] of criminal conduct," as there was in *Perez-Jungo*.[4] Whitecotton argues that no such category of criminal conduct exists in this case. Rather, Whitecotton contends that the detention was based only on the reporting citizen's "concern" that Whitecotton was suspicious because he was "hanging around a public place with a firearm," which he characterizes as an "inchoate hunch."[5] In support of this argument, Whitecotton submitted the Idaho Supreme Court's opinion

---

[4] In *Perez-Jungo*, this Court concluded that the totality of circumstances supported a detention to further investigate potential crimes involving impaired driving and illegal drug activity. *Perez-Jungo*, 156 Idaho at 616, 329 P.3d at 398.

[5] Contrary to Whitecotton's claim, the citizen's concern was not that Whitecotton was "hanging around a public place with a firearm," it was his behavior coupled with the fact that he was armed. The State highlighted this point in its response to Whitecotton's motion: "As noted in her statement, [the citizen's] concern was directed at Whitecotton's behavior with the firearm, not the mere fact that he was carrying a firearm."

in *State v. Gonzales*, 165 Idaho 667, 450 P.3d 315 (2019) as supplemental authority.[6]   In *Gonzales*, the Idaho Supreme Court held:

> While we agree that finding an individual horizontal on the floor of a vehicle may be suspicious, without more it cannot be a sufficient basis on which an officer finds reasonable suspicion of criminal activity.  The fatal flaws in the State's case are that [the officer] never *articulated* what *criminal* suspicion he had of Gonzales' behavior, other than the fact that Gonzales was perhaps hiding from him.  As we have iterated above, an officer must "have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. [411, 417-18 (1981)].

*Gonzales*, 165 Idaho at 774, 450 P.3d at 322 (citations omitted).  We do not read *Gonzales* as articulating a new or different standard than the one stated in *Perez-Jungo*.  Thus, we reject any claim by Whitecotton to the contrary.

The reasonable suspicion standard was first articulated by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968).  The Court opened the opinion in *Terry* by noting that the case presented "serious questions concerning the role of the Fourth Amendment in the confrontation on the street between the citizen and the policeman investigating suspicious circumstances." *Id.* at 4.  In addressing those questions, the Court acknowledged that "street encounters between citizens and police officers are incredibly rich in diversity" and that such encounters are initiated "for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime." *Id.* at 13.  Those encounters that cannot, as a practical matter, be subjected to the warrant procedure are instead "tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Id.* at 20 (quoting *Camara v. Mun. Court*, 387 U.S. 523, 534-35 (1967)).  The Court stated that there is "no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." *Id.* at 21.  "[I]n justifying the particular intrusion the police officers must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.*

The United States Supreme Court elaborated on the meaning of reasonable suspicion in *Cortez*, 449 U.S. at 417.  The Court explained:

---

[6]   The opinion in *Gonzales* was issued after this case was submitted on the briefs.

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions--inferences and deductions that might well elude an untrained person.

The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same--and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio*, *supra*, said that, "[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence.*" *Id.*, 392 U.S. at 21, n.18 (emphasis added).

*Cortez*, 449 U.S. at 418.

The encounter between Whitecotton and the officer passes constitutional muster under the Fourth Amendment reasonableness standard articulated in *Terry*. The officer made contact with Whitecotton because a concerned citizen went to the police department to report "suspicious" behavior.[7] The officer described the report as follows:

---

[7] The reporting citizen also provided a written statement after Whitecotton's arrest. The statement indicates that the incident occurred at 3:30 p.m. and reads as follows:

I went into [a local pharmacy] and noticed a man pacing out front after I picked up my prescription he was inside asking about maps. I left and went into [a supermarket] to meet with my brother when we went outside we ran into my other brother and a few friends and we were talking. A few minutes into the conversation the same man walked up to us and shook my brother[']s hand and introduced himself by first name. [H]e had a holstered gun on his side and he kept turning that side towards us which I thought was odd, he stood there while we continued talking for a few minutes which again I thought was odd so when I left I went to the P.D. and reported a suspicious person.

On 8/1/2016 at approximately 1620 hours, [a concerned citizen] and her brother, . . . came into the police department to report a person acting suspiciously and strangely at [a local pharmacy]. They advised that this person, later identified to be David Whitecotton, had randomly approached them and other patrons, introduced himself, then made a point to show off his sidearm to them. They were concerned about [Whitecotton's] behavior.

Prior to contacting Whitecotton, the officer was also aware that the subject of the report was "in a black Ford pick-up with Oregon license plates." When the officer arrived, Whitecotton was still parked in his vehicle, facing the pharmacy. The officer's body camera video shows that the officer parked several feet away from the vehicle, did not activate his lights or sirens, and approached the vehicle on foot. The officer's report articulated the following information relevant to his conversation with Whitecotton:

a.    [Whitecotton] had what he indicated to be a .44 revolver in a shoulder holster.
    i.    I later confirmed that it was a Ruger .44 Magnum.
b.    I asked [Whitecotton] what was going on and he said nothing was going on.
c.    [Whitecotton] started his pick-up instantly and said he was leaving.
d.    I instructed [Whitecotton] to turn the truck off so he could speak with me.
e.    I explained to [Whitecotton] the reason I was there.
f.    [Whitecotton] advised he went inside the store to ask them something.
g.    [Whitecotton] bought a football for a kid that he knows.
h.    I advised [Whitecotton] that I didn't see anything wrong with him buying a football.
i.    I asked [Whitecotton] for his driver's license. [Whitecotton] was hesitant and made a show of looking through miscellaneous items in the car.
j.    [Whitecotton] kept changing the subject and was telling me what he did in the store.
    i.    [Whitecotton] said he was looking for his money in the store.
    ii.    He showed me the football he bought in the store.
k.    [Whitecotton] didn't want to show me his driver's license and finally showed me a Veteran's identification card.
l.    While talking to [Whitecotton] he seemed to be hesitant and upset about me being there.
m.    A slight odor of an alcoholic beverage could be smelled coming from [Whitecotton's] breath.
    i.    [Whitecotton] advised he had not been drinking.
n.    [Whitecotton] said he was carrying the gun because people are less likely to commit a crime when he is around.
o.    [Whitecotton] lives in Oregon and is just passing by.

9

The video footage from the officer's body camera corroborates the observable facts set forth in the officer's report. The footage also shows that upon approaching Whitecotton, the officer was polite, never drew his service weapon, did not attempt to disarm or physically restrain Whitecotton, or even ask him to step out of his vehicle. Instead, the officer initiated a consensual encounter with Whitecotton and explained his reason for doing so. The officer's subsequent instruction to Whitecotton to turn off his vehicle and talk to him was reasonable under the circumstances so that the officer could address and resolve the concerns reported by the citizen and complete his report. In short, the officer employed the least intrusive means in investigating the citizen report, and his interaction with Whitecotton lasted no longer than was necessary. *See Florida v. Royer*, 460 U.S. 491, 500-01 (1983) (noting that an investigative detention must last no longer than is necessary to effectuate its purpose and that law enforcement should employ the least intrusive means reasonably available in confirming or dispelling suspicion).

That Whitecotton's behavior does not fall neatly within a specific category of criminal activity does not mean the officer lacked the requisite suspicion to approach Whitecotton and interact with him as the officer did. *See Adams v. Williams*, 407 U.S. 143, 146 (1972) (recognizing that a "brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time"); *cf. Baker v. Smiscik*, 49 F. Supp. 3d 489, 498 (E.D. Mich. 2014) (noting "long-recognized concerns for the safety of police officers and the public have taken on even greater urgency by recurrent tragedies triggered by gun violence in public spaces" and concluding that "[t]o prevent such tragedies, police are properly given sufficient freedom of action to investigate circumstances that reasonably suggest an immediate risk to officer or public safety"). As explained in *Terry*, reasonableness under the Fourth Amendment requires balancing the need for the seizure against the invasion the seizure entails. *Terry*, 392 U.S. at 21. The balance in this case supports the conclusion that no Fourth Amendment violation occurred. A limited seizure to investigate and identify an armed individual acting suspiciously by pacing and lingering in front of a business who at the same time is behaving abnormally by interjecting himself into the conversation of strangers and accentuating the presence of his holstered firearm does not offend the Fourth Amendment. The district court did not err in denying Whitecotton's motion to suppress.

**B.     Sentencing**

Whitecotton next argues the district court abused its discretion when sentencing him. Specifically, Whitecotton argues, based upon a single statement by the district court during a hearing on a motion seeking a sentence reduction, that the district court failed to act according to applicable legal standards because it considered the fact that Whitecotton exercised his constitutional right to a jury trial. The State responds that, when taken in context, the district court's allegedly improper statement does not indicate that Whitecotton was being punished for exercising a constitutional right. The State further argues that, even if the district court improperly considered Whitecotton's demand for a jury trial, the district court did not abuse its discretion because Whitecotton's sentence is supported by other proper rationales.

It is improper for a court to penalize a defendant merely because he or she exercises the right to put the government to its proof at trial. *State v. Kellis*, 148 Idaho 812, 814, 229 P.3d 1174, 1176 (Ct. App. 2010). We will not, however, vacate a sentence whenever a comment by a district court implies a defendant is being punished for exercising his or her right to plead not guilty. *State v. Brown*, 131 Idaho 61, 72, 951 P.2d 1288, 1299 (Ct. App. 1998). Rather, a sentence will be vacated only when the totality of the circumstances indicates the district court sentenced a defendant based upon a vindictive or punitive motive. *Id.*

Whitecotton contends that the following comment by the district court during a hearing on his motion seeking a sentence reduction shows that his sentence was influenced by a desire to penalize him for exercising his right to a jury trial: "[The Court] certainly had to look at the case much differently once [Whitecotton] withdrew that plea and required the State to prove his guilt to a jury." When viewed in isolation, this statement could be interpreted as evincing a motive to punish Whitecotton for asserting his right to a trial. However, the statement must be considered in light of the entire record. *See id.* The statement arose in the midst of the following larger discussion of Whitecotton's lack of cooperation with the justice system:

> Looking at whether or not further leniency with regard to the fixed sentence, [Whitecotton] had previously pled guilty, and we were set for sentencing, and [he] then just determined in his mind that he was not going to appear for sentencing, and so then we had to have him arrested, and then he withdrew his plea, and he had his opportunity to go to trial.
> *[The Court] certainly had to look at the case much differently once he withdrew that plea and required the State to prove his guilt to a jury.* I think the

11

two-year fixed sentence . . . is sufficient in order to accomplish the goals of punishment and protection of society. The three-year indeterminate sentence, I would hope that he would be able to parole and be a productive citizen here in either Idaho or Oregon, but I think that would be the idea behind rehabilitation for him.

So considering those goals of sentencing, I think the two-year fixed, three years indeterminate sentence was appropriate under the circumstances. And so, based on that, the Court is going to deny the Rule 35 motion.

(Emphasis added.)

In context, the statement upon which Whitecotton relies is more properly interpreted as an observation by the district court that Whitecotton's conduct demonstrated his belief that he did not have to comply with the court's orders and that he did not accept responsibility for his conduct. The district court noted that Whitecotton had a history of similar behavior. The court could consider such factors when fashioning a sentence. *See Brown*, 131 Idaho at 73, 951 P.2d at 1300 (observing that a court can consider the failure to accept responsibility in relation to a defendant's prospects for rehabilitation). The district court's single statement regarding Whitecotton's exercise of his right to a jury trial does not establish that his sentence violates applicable legal standards.[8] Therefore, Whitecotton has failed to show that his sentence constitutes an abuse of discretion.

## IV.

## CONCLUSION

The district court correctly concluded that the officer had reasonable suspicion to detain Whitecotton. Thus, Whitecotton has failed to show that the district court erred in denying his motion to suppress. Additionally, when viewed in the context of the entire record, the district court's comment regarding Whitecotton's decision to exercise his right to a jury trial does not establish that any vindictive or punitive motive influenced his sentence. Thus, Whitecotton has failed to show that his sentence constitutes an abuse of discrtion. Accordingly, Whitecotton's judgment of conviction and sentence for unlawful possession of a firearm are affirmed.

Chief Judge HUSKEY and Judge BRAILSFORD, **CONCUR**.

---

[8] Because we conclude that the district court did not err in making a comment that could be construed as implying Whitecotton was being punished for exercising his right to a trial, we will not consider the State's alternative argument that Whitecotton's sentence can be upheld despite consideration of an improper rationale.